## In re MIDWEST SERVICE AND SUPPLY CO., INC., Debtor.

## UNITED STATES of America, Appellant,

v.

## MIDWEST SERVICE AND SUPPLY COMPANY, INC., Appellee.

Bankruptcy No. 82M–00329.
Appeal No. C–83–0411A.

United States District Court,
D. Utah, C.D.

Dec. 15, 1983.

Barbara W. Richman, Asst. U.S. Atty., Salt Lake City, Utah, for appellant.

Steven C. Tycksen, Murray, Utah, for appellee.

## MEMORANDUM OPINION AND ORDER

ALDON J. ANDERSON, Chief Judge.

On November 7, 1983, the United States District Court for the District of Utah, Central Division, the Honorable Aldon J. Anderson, Chief Judge, presiding, heard oral argument on the appeal of the United States of America from the Order of the Honorable Glen E. Clark, United States Bankruptcy Judge, entered March 8, 1983, wherein the bankruptcy court found the United States of America in contempt for violating the automatic stay provision of 11 U.S.C. § 362. Fredye Eckhart appeared on behalf of the appellant, the United States of America; Steven C. Tycksen appeared on behalf of the debtor-appellee Midwest Service and Supply Co., Inc.; and John T. Morgan appeared representing Roger C. Segal, the trustee of the estate of Midwest Service and Supply Co., Inc. The court having examined the record on appeal, including the order of Judge Clark, and having heard oral arguments and analyzed the briefs, hereby enters this Memorandum Opinion and Order.

## I. FACTS

In 1978, Midwest Service and Supply Co., Inc. ("Midwest"), entered into a time and materials agreement with the General Services Administration ("GSA") of the United States government ("government"). This agreement authorized various departments of the executive branch of the government to issue delivery orders to Midwest for the maintenance, repair and overhaul of heavy construction industrial and vehicular equipment. At the time Midwest filed a Chapter 11 petition in bankruptcy on February 9, 1982, twenty executory contracts between the Department of the Army and Midwest existed. Each of these contracts was a fixed price delivery order under the terms of the GSA time and materials agreement and provided for the repair of a number of items of heavy equipment.

Each contract contained Defense Acquisition Regulation (DAR) clause 7–104.35(b) (1978 July), Progress Payment For Small Business Concerns. This clause was added by modification to each of the twenty contracts in January of 1981. The progress payment clause provided that Midwest could bill the government as work progressed and receive progress payments rather than receiving one lump sum payment when work was completed and delivered to the government. Midwest exercised this option and submitted periodic billings to the government. In each billing,

Midwest was required to certify that the work had been performed and that after making the requested progress payment the unliquidated progress payments would not exceed the maximum unliquidated progress payments permitted by the contract.

Under the terms of the progress payment clause, the government paid Midwest 85 percent of the total costs Midwest claimed had been incurred under the contract, or, in other words, the certified amount requested by Midwest. The progress payment clause provided that all progress payments would be liquidated by deducting from any payment under the contract the amount of unliquidated progress payments, or eighty-five percent (85%) of the gross amount invoiced. Thus, where an invoice represented final payment under a contract, the government deducted the amount already paid for the work as it progressed and only paid the remaining balance due on the contract.

After Midwest filed the petition in bankruptcy, the government discovered that the unliquidated progress payment amounts (total monies paid on undelivered items) on some contracts exceeded the fair value of the work performed. The fair value of the work performed was computed based upon a physical analysis of the work completed. When that was done, a calculation was made to determine how much of the unliquidated progress payments must be considered overpayments.

Midwest, the debtor-in-possession, continued performance under several of the contracts subsequent to its filing of the petition in bankruptcy. Upon shipment of a completed item under a particular contract, the government recouped the overpayments of progress payments before paying a reduced invoice amount to Midwest. Performance by the debtor-in-possession, shipment of a unit, and the subsequent recoupment reduced the total overpayment.

Because of such recoupment, Midwest filed a motion seeking to hold the government in contempt for violating the automatic stay. At a hearing held July 20, 1983, the bankruptcy court found that there had been a pre-petition overpayment and that the government had reduced the overpayment after the filing of the petition in bankruptcy, thus violating the automatic stay. On March 8, 1983, the bankruptcy court entered an order based on its ruling of July 20, 1983, finding the government in contempt for violating the automatic stay by reducing the amount of its pre-petition debt in the nature of an overpayment by the amount of $49,708.00 from February 9, 1982, through July 20, 1982. The court also awarded the debtor $2,000.00 for attorney's fees. The government appealed from this order on March 31, 1983.

## II. ANALYSIS

The basic issue on appeal is whether the government violated the automatic stay provision of 11 U.S.C. § 362 by recouping unliquidated progress payments containing overpayments.

The government argued that it did not commence or continue any post-petition action to collect any of the overpayments. It argued that when the debtor initiated post-petition deliveries under the contracts, it knew that unliquidated progress payments, including overpayments of progress payments, would be liquidated in accordance with the contract. The status quo at the date of the petition in bankruptcy was altered by the debtor's post-petition deliveries triggering the liquidation portion of the contract. The government's position was that the reduction which took place was not because of any act of the government, but because "contract performance reduces the estimated amount of overpayments as the contractor 'catches up' with the percentage of completion for which he was erroneously paid progress payments." The government also argued that having sought the benefit of post-petition performance, the debtor must also accept the burden of the liquidation portion of the progress payment clause in the same contract. Hence, the recovery of overpayments is not prohibited under the Bankruptcy Code, being a re-

coupment rather than a setoff under 11 U.S.C. § 553.

Midwest's position was that the contracts were never assumed by the debtor. Midwest argued that an executory contract must be assumed expressly by the debtor and the assumption must receive the formal approval of the court. Midwest stated that the recoupment provision of the contract cannot be enforced against post-petition performance by the debtor-in-possession since the contract was not formally assumed by the debtor and approved by the court. Midwest asserted that were the court to uphold the government's position it would allow the government to place itself in a priority status on post-petition income of the debtor-in-possession over administrative expenses and that this would be contrary to the priorities of distribution as defined by bankruptcy law.

The trustee of the estate of Midwest made substantially the same argument as the debtor. The trustee argued that the government is not entitled to an administrative expense given priority under 11 U.S.C. § 503 for the debt resulting from the pre-petition overpayments. Also that the executory contracts in question were never accepted or rejected by the debtor and that the debtor-in-possession cannot assume an executory contract with an unsecured creditor to the detriment of all other unsecured creditors; nor can it expressly or de facto assume the contracts without the express approval of the bankruptcy court. Since the bankruptcy court never approved assumption of the contracts, the trustee argued that there was no basis to recoup any pre-petition overpayments.

The bankruptcy court ruled that the reduction of overpayments by recoupment of progress payments provided for in the contract violated the automatic stay provision. Apparently, because it deemed overpayment of progress payments to be a pre-petition debt, the court believed the government could have proceeded against the debtor pre-petition and thus, post-petition action by the government was subject to the automatic stay. The court necessarily found that the government's withholding of payment was an act within the meaning of 11 U.S.C. § 362(a).

This court on review is of the opinion that having sought the benefit of post-petition performance under the contracts, the debtor must also accept the burden of the liquidation portion of the progress payment contract clause. As long as the debtor continues to receive the benefits under a contract it must also bear the burdens of obligations imposed under the contract. *In Re Yonkers Hamilton Sanitarium, Inc.*, 22 B.R. 427, 435 (Bankr.S.D.N.Y.1982). The fact that neither the debtor nor the government applied to the court for a formal assumption or rejection of the contracts is not dispositive. That neither party to an executory contract takes action with respect to assumption or rejection does not mean that the contract has no significance. Even where court approval was not obtained, the debtor-in-possession may be deemed to have adopted the contract where it received benefits. *In Re Shoppers Paradise, Inc.*, 8 B.R. 271, 279 (Bankr.S.D.N.Y.1980).

 The court finds that Midwest elected to continue its participation under the contracts and in so doing it assumed the burdens of contractual provisions regarding overpayments. The progress payment clause authorized the reduction of payments for current or future deliveries to recover prior overpayments. Midwest may not assert the automatic stay as a weapon to obtain the benefits under the contract with the government and simultaneously prevent the government from netting out against the contract the recoupment allowed by the contract. *In Re Yonkers Hamilton Sanitarium, Inc., supra* at 435.

 There is a distinction in the law between a recoupment and a setoff. The automatic stay prevents pre-petition obligations from being set off against post-petition obligations. There is no similar restriction in the case of recoupments. A setoff under 11 U.S.C. § 553 involves mutual debts or mutual credits between the estate of a debtor and a creditor whereby

claims arising out of different transactions or occurrences are offset. *Quittner v. Los Angeles Steel Casting Co.*, 202 F.2d 814 (9th Cir.1953). Recoupments, unlike set-offs, do not involve the concept of mutuality of obligations and arise out of the same transaction rather than out of different transactions. As stated in 4 *Collier On Bankruptcy*, ¶ 553.03 at 553–12 (15th ed. 1983):

> Recoupment ... is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim .... Certainly in any suit or action between the estate and another, the defendant should be entitled to show that because of matters arising out of the transaction sued on, he is not liable in full for the plaintiff's claim. There is no element of preference here or of an independent claim to be offset, but merely an arrival at a just and proper liability on the main issue, and this would seem permissible without any reference to former Section 68 or to Section 553(a).

The only real requirement regarding recoupment is that a sum can be reduced only by matters or claims arising out of the same transaction as the original sum. *See Waldschmidt v. CBS, Inc.*, 14 B.R. 309 (W.D.Tenn.1981). A single contract must be considered as one transaction. The progress payments and the recoupments were made according to the terms of each contract. The government was simply applying the progress payment clause to the single transaction to determine how much was due Midwest. The court concludes that this involved a recoupment rather than a setoff. The significance of this finding is that a recoupment is not prohibited by the automatic stay.

Midwest argued that allowing the government to recoup pre-petition overpayments amounts to a priority not provided in the Code. The court does not find this argument persuasive in light of the above discussion on setoffs and recoupments. It should be remembered that the pre-petition overpayments of progress payments oc-curred because Midwest billed the government for amounts exceeding its actual costs incurred as related to the percentage of completion. The government, as an unwilling creditor on the overpayment amounts, as a remedy for overpayment, only had recourse to the liquidation provision in the progress payment clause of each contract concerning future payments. Subsequent to the filing of the petition in bankruptcy the debtor could have rejected the executory contracts. The debtor chose to perform under the contracts with full knowledge of the terms of the contracts and the existing unliquidated progress payments, including overpayments. The government took no affirmative steps to collect the overpayments as such, but rather followed the ordinary recoupment provisions of the contract clause.

## III. ORDER

Based on the foregoing analysis, the court orders that the ruling of the bankruptcy court should be reversed, that the order of contempt and the award for attorney's fees be rescinded and that the government be allowed to claim the amounts in question by way of recoupment.