In re **KLINGBERG SCHOOLS**, an Illinois not-for-profit corporation, Debtor.

Jay **STEINBERG**, Trustee of the Estate of Klingberg Schools, an Illinois not-for-profit corporation, by certain creditors, Plaintiff-Appellee,

v.

**ILLINOIS DEPARTMENT OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES**, Defendant-Appellant.

No. 86 C 3001.

United States District Court, N.D. Illinois, E.D.

Nov. 25, 1986.

**174**

John Gubbins, Chicago, Ill., for plaintiff-appellee.

Thomas P. Marnell, Noel English, Office of the Attorney General, Chicago, Ill., for defendant-appellant.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is an appeal from the Bankruptcy Court's entry of Judgment in favor of plaintiff, debtor, Klingberg Schools in the amount of $530,680.53. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

### FACTS

The plaintiff-appellee is Jay Steinberg, trustee of the estate of Klingberg Schools, a not-for-profit Illinois corporation which operated as a facility for the care and treatment of mentally handicapped children. The defendant-appellant is the Illinois Department of Mental Health and Developmental Disabilities ("DMHDD"). The DMHDD is the state agency responsible for overseeing the funding of treatment and care for mentally retarded persons in public and private facilities in Illinois. The DMHDD was one of Klingberg Schools' primary sources of funding.

On August 15, 1977, Klingberg Schools entered into a purchase of service contract with the DMHDD under which the Klingberg Schools was to provide residential care and services for DMHDD-sponsored clients for which the DMHDD agreed to pay $25 per diem per client, subject to applicable Department Rules. This contract was to have terminated on June 30, 1978. The parties agreed to continue the contract in 1978 to and including June 30, 1979, and in 1979, to and including June 30, 1980. On November 30, 1979, the DMHDD wrote to Klingberg Schools that the per diem rate would be modified by any amounts of other financial support available to or on behalf of the clients, including those amounts available for education services under Federal Public Law 94–142. As a result of this federal law, a per diem sum of $27.04 was administered and paid to the Klingberg Schools through the Illinois Office of Education ("IOE"). In November 1979, the DMHDD determined that it would increase the actual per diem rate from $25.00 to $32.92 retroactive to July 1, 1979, but that it would then deduct the federal funding of $27.04 from any payments it had made and would make to the school, leaving the Klingberg Schools with an actual per diem rate of $5.88 from the State. When the Klingberg Schools was informed of the November 1979 unilateral decision of DMHDD, it objected in a letter dated January 7, 1980. The Klingberg

Schools signed an addendum to the contract sent by DMHDD, Addendum 5, under protest, but refused to sign Addendum 6, a document setting forth the method by which the state intended to recover the $27.04 retroactive deductions from July 1, 1979.

On January 18, 1980, the Klingberg Schools filed a petition in bankruptcy under Chapter 11. The Klingberg Schools submitted its February 1980 billing at the $25.00 rate. The DMHDD subsequently sent the Klingberg Schools' rate sheets which reflected the $32.92 rate increase coupled with the $27.04 deduction for the federal funding and also reflected a credit to the DMHDD for the retroactive backcharge for federal funding back to July 1979 and a debit for the retroactive rate increase to July 1979. The DMHDD informed the Klingberg Schools that it had to submit a new request reflecting the new retroactive rate before the DMHDD would pay the schools' February 1980 billing. When the school was finally paid, the DMHDD retained $155,092.83, representing the retroactive deductions for federal funding; it deducted $33,296.40, representing current deductions for federal funding for February 1980. Thus, for the Klingberg Schools' $225,714.52 February 1980 bill, the DMHDD paid only $35,223.50.

In total, Judge Thomas James of the Bankruptcy Court found that the DMHDD improperly set-off $213,606.68 from postpetition reimbursement to the debtor in satisfaction of alleged pre-petition overpayments and $132,945.95 which had also been improperly set-off from post-petition reimbursement to debtor in satisfaction of alleged post-petition overpayments.

In the spring of 1979, Dr. Robert DeVito, director of the DMHDD requested the Klingberg Schools to prepare a Request of Payment to the DMHDD for night care services delivered during the fiscal year 1979 in the amount of $164,442.83. The agreement between the parties provided that "[a]t all times during the existence of this Contract, the Agency [Klingberg Schools] agrees to remain in compliance

with applicable federal, state and local licensing requirements, including those of the State of Illinois." (Purchase of Service Contract ¶ XV). But the agreement did not provide for payment of night care services. Dr. DeVito testified that he directed the Klingberg Schools to prepare this request after he had a discussion with Mr. Robert Klingberg concerning the Klingberg Schools' providing night care for its clients in compliance with the Department of Children and Family Services' requirements. Although the Klingberg Schools provided night care services during the fiscal 1979 year at a cost of $164,442.83, the DMHDD had not and was not funding any night care services. Dr. DeVito testified that he presented the request to the Illinois Governor's Purchased Care Review Board in July 1979. The Board approved payment of the request, and Dr. DeVito directed that the request be paid. Dr. DeVito testified that he directed his people to pay the bill during the State's lapse period, July and August of 1979. He testified that he directed that the bill be paid during this period because, after that time period, unsatisfied claims had to be submitted to the Court of Claims, a procedure likely to take two to four years. (T.R. II 16–18, 25–27). The bill was not paid during the lapse period by the DMHDD apparently because Dr. DeVito and his staff were concerned with what impact paying the claim for the Klingberg Schools would have on other facilities. (T.R. II 25–27). Once the lapse period expired, however, the DMHDD could no longer pay the bill, and it had to be submitted to the Illinois Court of Claims. The bill was never submitted to the Court of Claims.

The DMHDD filed two claims, for pre-payment for contractual services not provided, against the estate: one for $14,333.95 and one for $17,622.06.

In October 1985, a trial was held on plaintiff schools' complaint before Bankruptcy Judge James, who found that the DMHDD had to pay $164,442.83 for the night care services provided in 1979, $213,606.68 which had been improperly set-off

from post-petition reimbursement to the debtor in satisfaction of alleged pre-petition overpayments; $132,945.95 which had been improperly set-off from post-petition reimbursement to debtor in satisfaction of alleged post-petition overpayments; $16,-396.96 for services which the debtor rendered but were unpaid by the DMHDD and $3,288.11 for the DMHDD's pre-petition claim offset in April 1980. Judgment was entered in plaintiff's favor and against defendant DMHDD for $530,680.53. The court did not rule on the DMHDD's claim, but granted the DMHDD leave to file an amended claim on or before May 1, 1986.

## ISSUES ON APPEAL

The Department of Mental Health and Developmental Disabilities raises two issues upon appeal. First, it contends that the Bankruptcy Judge erred in holding the DMHDD liable on plaintiff's claim for night care services because plaintiff's claim for night care services because plaintiff's action was proscribed by sovereign immunity. Secondly, the DMHDD contends that the Bankruptcy Court erred in holding that the DMHDD improperly set-off debts owed to Klingberg Schools in violation of the automatic stay of section 362 of the Bankruptcy Code. 11 U.S.C. § 362.

### Sovereign Immunity

The Bankruptcy Court held the DMHDD liable for $164,442.83 which had been approved by the Illinois Governor's Purchased Care Review Board to reimburse the Klingberg Schools for night care services provided in 1979, but which had never been paid. The DMHDD contends that the Bankruptcy Court erred by allowing the Klingberg Schools to pursue its claim for

night care services in this action for two reasons. First, the DMHDD contends that under section 106(a) of the Bankruptcy Code [1] the Schools' night care claim did not arise out of the same transaction or occurrence out of which the DMHDD's claim for overpayment arose. Secondly, the DMHDD contends that section 106(c) does not operate to waive the sovereign immunity of the state either. Because we disagree with defendant's position and find that the night care claim does arise out of the same transaction or occurrence out of which the state's claim arose, we do not decide whether section 106(c) would also allow plaintiff to bring its claim for night care services against the DMHDD in federal bankruptcy court.

The legislative history of section 106(a) demonstrates Congress' intent to abrogate a state's sovereign immunity when to do otherwise would be contrary to the underlying policy of the bankruptcy Code. The legislative history of section 106(a) states:

> Section 106 provides for a limited waiver of sovereign immunity in bankruptcy cases.... Congress does not ... have the power to waive sovereign immunity completely with respect to claims of a bankrupt estate against a State, though it may exercise its bankruptcy power through the supremacy clause to prevent or prohibit State action that is contrary to bankruptcy policy.

> There is, however, a limited change from the result that would prevail in the absence of bankruptcy; the change is twofold and is within Congress' power vis-a-vis both the Federal Government and the States. First, the filing of a proof of claim against the estate by a governmental unit is a waiver by that governmental

---

1. Bankruptcy Code § 106 provides:
   (a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.
   (b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—
(1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and
(2) a determination by the court of an issue arising under such a provision binds governmental units.
11 U.S.C. § 106 (1982).

unit of sovereign immunity with respect to compulsory counterclaims, as defined in the Federal Rules of Civil Procedure ... that is, counterclaims arising out of the same transaction or occurrence. The governmental unit cannot receive a distribution from the estate without subjecting itself to any liability it has to the estate within the confines of a compulsory counterclaim rule. Any other result would be one-sided. The counterclaim by the estate against the governmental unit is without limit.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 317 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 29 (1978), *reprinted in* 1978, U.S.Code Cong. & Admin.News 5787, 5815. Therefore, in deciding whether the night care claim arose from the same transaction or occurrence as the State's claim, we are to be guided by the interpretations of Federal Rule of Civil Procedure 13(a) concerning compulsory counterclaims.

Courts have generally agreed that the words "transactions or occurrence" should be interpreted liberally in order to further the general policies of the federal rules of civil procedure and carry out the philosophy of Rule 13(a). *Warshawsky & Co. v. Arcata National Corp.*, 552 F.2d 1257, 1261 (7th Cir.1977). The purpose of the rule is to prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters. *Id. citing Southern Construction Co. v. Pickard*, 371 U.S. 57, 60, 83 S.Ct. 108, 109, 9 L.Ed.2d 31 (1962). A counterclaim arises out of the same transaction or occurrence when it is "logically related" to the opposing party's claim. *USC Corp. v. SPS Technologies, Inc.*, 102 F.R.D. 167 (N.D.Ill.1984). *See also Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926). Thus, the term "transaction" is to be construed generously to avoid the unnecessary expense inherent in a multiplicity of litigation. *Warshawsky*, 552 F.2d at 1261.

We are convinced that the Klingberg Schools' claim for night care services arises out of the same transaction or occur-

rence as the DMHDD's claim for overpayment under the contract between DMHDD and the Klingberg Schools. The DMHDD filed two claims, one for $14,333.95 and one for $17,622.06. Both claims were for "[p]repayment for contractual Services not provided." There has at all times been only one contract between these parties. It was to end in 1978, but was extended by the parties to and including June 30, 1980. This contract provided that the Klingberg Schools had to remain in compliance with all applicable state, federal and local licensing requirements. It is because of this provision that the Klingberg Schools contended that it provided the night care services. This was the reason Dr. DeVito submitted the claim to the Illinois Governor's Purchased Care Review Board. Thus, the Klingberg Schools' night care claim and the DMHDD's claim for overpayment are both based on the same contract. The DMHDD's overpayment claim related to services allegedly not provided at the Klingberg Schools, the Schools' night care claim was for services it provided at this school pursuant to the licensing requirements. Thus, services were provided and not provided at the same school. Although the facts related to each claim may not be identical, there clearly appears to be a logical relationship between the DMHDD's claim for overpayment under the contract and the Klingberg Schools' claim for unreimbursed night care services incurred because of the terms of the contract. Under the liberal standards of F.R. Civ.P. 13(a) which are incorporated into section 106(a) of the Bankruptcy Code, we find that the Klingberg Schools' claim for night care services arises out of the same transaction or occurrence as the DMHDD's claim for overpayment for contractual services not provided. Therefore, pursuant to 11 U.S.C. § 106(a), the DMHDD is deemed to have waived its sovereign immunity, and the Klingberg Schools may bring its claim for night services against the State in this action.

### Breach of Automatic Stay

Defendant DMHDD contends that the Bankruptcy Court erred in holding that the

DMHDD set-off debts owed to Klingberg Schools in violation of the automatic stay imposed by 11 U.S.C. § 362.[2] DMHDD further contends that to the extent that it deducted and retained amounts due under the Debtor School's post-petition claims, the deductions constituted a valid recoupment of pre-petition amounts overpaid the debtor. DMHDD thus argues that as a recoupment, their action was not subject to the provisions of section 362. Because we do not agree that DMHDD's deductions were "recoupments," we do not address the issue of whether "recoupments" are not subject to the automatic-stay provisions of section 362.[3]

Recoupment originated as an equitable rule of joinder. It allowed adjudication in one suit of two claims that otherwise had to be brought separately under common-law forms of action. Under recoupment, a defendant could meet a plaintiff's claim with a countervailing claim that arose out of the same transaction. *In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir. 1986). The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on set-off in bankruptcy would be inequitable. *Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984). Recoupment differs from set-off principally in that the claim must grow out of the identical transaction that furnishes the plaintiff's cause of action and because it is in the nature of a claim of right to reduce the amount demanded, it can be asserted only to the extent sufficient to satisfy the plaintiff's claim. *In re American Central Airlines*, 60 B.R. 587 (Bankr.N.D.Iowa 1986). Unlike set-off, recoupment does not confess the indebtedness alleged in the complaint, but rather its proposition is that the plaintiff's claim is based on a particular contract or transaction and that to entitle the plaintiff to the sum claimed, he must prove compliance with certain obligations of the contract; that he has failed to do so; and therefore that the defendant has been so damaged in the transaction that the plaintiff is not entitled to recover. 20 Am. Jur.2d *Counterclaim, Recoupment, and Setoff* § 11 (1965).

The doctrine of recoupment has been applied in the bankruptcy context to allow creditors to recoup amounts owed by the debtor for pre-petition debts from payments to debtor for post-petition earnings. Thus, for example, where a construction sub-contractor failed to complete its contracts to do masonry work, the trustee was unable to recover the balance due on the contract until the contractors were allowed

---

**2.** Bankruptcy Code § 362 provides in pertinent part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under 5(a)(3) of the Securities Investor Protection Act of 1970 ... operates as a stay, applicable to all entities, of—
> * * * * * *
> (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and ... 11 U.S.C. § 362(a)(7) (1982 & Supp. III 1985).

**3.** While the exact wording of section 362(a) does not refer to recoupments *per se*, at last one court has found that recoupments are not exempt from the provisions of section 362. *See In re Ohning*, 57 B.R. 714 (Bankr.N.D.Ind.1986), *but see In re American Central Airlines*, 60 B.R. 587 (Bankr.N.D.Iowa 1986); *In re Midwest Service and Supply Co.*, 44 B.R. 262 (D.Utah 1983); *In re Maine*, 32 B.R. 452 (Bankr.W.D.N.Y.1983). Although we do not decide this issue, it would seem that recoupment should be subject to the stay because the purpose of the automatic stay is to give "the debtor a breathing spell from his creditors" and to permit the debtor to attempt a repayment or reorganization plan, or simply "to be relieved of the financial pressures that drove him into bankruptcy" without the specter of his creditors breathing down his neck. S.Rep. No. 989, 95th Cong., 2d Sess. (1978), 1978, U.S.Code Cong. & Admin.News 5787. Even though the Bankruptcy Code provides a limited exception to the discharge of all debts for certain setoffs under 11 U.S.C. § 553, the automatic stay applies to such setoffs, and a creditor may not set off the debt without leave of the court under section 362. The same reasoning which makes all setoffs subject to the automatic stay provisions should apply to recoupments.

to recoup their damages for breach of contract from the balance due on the contract. *In re Clowards,* 42 B.R. 627 (Bankr.D.Idaho 1984). *Accord In re Midwest Service and Supply Co.,* 44 B.R. 262 (D.Utah 1983) (government permitted to recoup overpayments of progress payments on construction contract). A recoupment has also been found appropriate in situations where the contract anticipated advance payments on revenues to be earned later. For example, in *Waldschmidt v. CBS,* 14 B.R. 309 (M.D.Tenn.1981), CBS made advances to singer George Jones when he recorded certain songs prior to his filing of bankruptcy. CBS was permitted to recoup these advances from royalties which accrued subsequent to the bankruptcy. The contract between the parties specifically provided for advances and subsequent recoupment from royalties, and the court found that the royalties and the advances arose from the same transaction. *See also In re Sherman,* 627 F.2d 594 (2d Cir.1980) (insurance company permitted to recoup commission advances). The recoupment doctrine was also used to allow the government to recover Medicare overpayments from post-bankruptcy reimbursements to a hospital that continued to operate after filing a Chapter 11 petition. *In re Yonkers Hamilton Sanitarium, Inc.,* 22 B.R. 427 (Bankr.S.D.N.Y. 1982), *aff'd* 34 B.R. 385 (S.D.N.Y.1983). *See also, In re Maine,* 32 B.R. 452 (Bankr. W.D.N.Y.1983) (State could recoup unemployment insurance benefits received by the debtor as a result of debtor's misrepresentations from benefits paid after the filing of bankruptcy). Finally, recoupment was found appropriate in a situation where the creditor had overpaid the debtor for the purchase of oil under their contract. The creditor sought a declaratory judgment that it had properly recouped its pre-bankruptcy overpayments from payment to the debtor after the debtor filed for bankruptcy. The Tenth Circuit found that the recoupment doctrine was appropriate because the debtor had continued after bankruptcy to make sales to the creditor at the prices and subject to the other terms of the contract between the parties. *In re B & L Oil*

*Company,* 782 F.2d 155 (10th Cir.1986). *See also In re American Central Airlines,* 60 B.R. 587 (Bankr.N.D.Iowa 1986) (DOT permitted to recoup subsidy overpayments to air carrier from post-petition payments). The court held that the debtor had to accept the burdens of contract, in that case the earlier overpayments, if it wanted to continue to accept the benefits of the contract.

■ With an understanding of how the recoupment doctrine in bankruptcy has developed, let us consider the instant case. The DMHDD characterizes the factual situations in this case as the mere recoupment of overpayments under the contract made prior to the filing of bankruptcy from amounts earned under the contract subsequent to the petition in bankruptcy. It is true that the contract between the parties contemplated the payment in advance of estimated charges followed with an end of the month adjustment to be reflected in the next month's payment. This, however, is not the source of the DMHDD's overpayments. Here, five months after this contract period commenced (July 1979 to November 30, 1979), the DMHDD notified the Klingberg Schools that it had decided to change the rates under its contract and also to deduct the amount of federal funds received by the school from the monthly payments. Additionally, the DMHDD decided that this rate change and rate deduction would be applied retroactively to July 1979. The plaintiff school contends that this was in direct violation of the contract between the parties which provided: "The rate payable by the Department under this contract may not be modified during the existence of this Contract *except by mutual written agreement.*" The school did sign Addendum 5 under protest, but refused to execute Addendum 6 which set out the State's plan for recovering its retroactive backcharges. The Bankruptcy Court made no specific finding as to whether or not the DMHDD's unilateral redetermination constituted a breach of the parties' contract. The Klingberg Schools contends that the DMHDD's actions terminated the

contract. The DMHDD does not reply to this position, other than to claim that "while the contract between DMHDD and Klingberg did not anticipate the increase in federal monies, the failure of the parties to anticipate such circumstances should not preclude DMHDD from recouping funds when payments to Klingberg Schools exceeded the value of the services provided by Klingberg."[4] The problem with this position is that it directly contradicts the actual terms of the contract between the parties. Not only does the contract provide that the rate may only be changed by mutual agreement, but that in the "event of default with the terms of this Contract, it may be terminated immediately by either party." Although the DMHDD styled their rate reduction as a modification of the rate because of receipt by the Klingberg Schools of federal funding, the result was a unilateral rate reduction from $25.00 per diem to $5.88 per diem. This is clearly not the same situation as present in true recoupment cases, where the overpayed sums were not contested, only the appropriateness of their recoupment. *See, e.g., In re B & L Oil Co.,* 782 F.2d 155 (10th Cir.1986); *In re Midwest Service and Supply Co.,* 44 B.R. 262 (D.Utah 1983); *Waldschmidt v. CBS,* 14 B.R. 309 (M.D.Tenn.1981); *In re American Central Airlines,* 60 B.R. 587 (Bankr.N.D.Iowa 1986); *In re Clowards,* 42 B.R. 627 (Bankr.D.Idaho 1984); *In re Maine,* 32 B.R. 452 (Bankr.W.D.N.Y.1983); *In re Yonkers Hamilton Sanitarium, Inc.,* 22 B.R. 427 (Bankr.S.D.N.Y.1982).

As the Klingberg Schools noted in its brief, the sums the defendant DMHDD is attempting to recover were not overpayments by the DMHDD, but payments made by the federal government. The DMHDD's actions were predicated upon the federal government's funding increase, a matter which had no relationship to the contract between the parties. Thus, even if the DMHDD did have the right to recover the amounts paid to the school by the federal government, it may not do so by way of recoupment. Recoupment is properly available when the sums claimed by the defendant arise out of the same transaction as those claimed by the claimant (here the Klingberg Schools). As noted earlier, recoupment is a defense to assert that the claimant did not perform its part of the bargain and is not entitled to recover from defendant, a claim that is clearly lacking in the present case. The DMHDD never claims that the Klingberg Schools did not provide the contracted for services, only that because of another funding source, *extrinsic* to the parties' relationship, that the Klingberg Schools was overpaid. Because the claimed overpayments were the result of payments by a third party, extrinsic to the contract between the DMHDD and the Schools, the overpayments did not arise out of the same transaction as the post-petition debt to the Klingberg Schools. As the Bankruptcy Judge noted, the equities in this case clearly lie with the Klingberg Schools and its other creditors. "DMHDD's alleged 'overpayments' may have exacerbated the positions of Klingberg Schools' creditors by permitting the schools to operate far beyond the time that a watchful creditor might have." The only "windfall" present in this case is the "windfall" the defendant DMHDD seeks for itself, by improperly setting-off post-petition debts with pre-petition debts. The DMHDD should have no better standing than other creditors. Therefore, we find that the defendant improperly asserted a set-off, and not a recoupment, in violation of the automatic stay provisions of 11 U.S.C. § 362.

## CONCLUSION

We find that the Klingberg Schools' claim for night care services arose out of the same transaction or occurrence as the DMHDD's claim for overpayment of con-

---

**4.** Plaintiff Klingberg Schools takes strong exception to this statement and contends that "no evidence of this fact is found anywhere in the record." We do not interpret DMHDD's statement as a factual statement, but rather as a comment on the contents of the parties' contract. A reading of the contract does not reveal any discussion as to the possibility of federal funding.

tractual services and therefore, the DMHDD is deemed to have waived its sovereign immunity and the Klingberg Schools could properly bring its claim for night care services in this action. Additionally, we find that the DMHDD improperly set-off amounts owing to the debtor Klingberg Schools in violation of the automatic stay provisions of 11 U.S.C. § 362. We therefore affirm the Bankruptcy Judge's order entering judgment in favor of Jay Steinberg, trustee of the estate of Klingberg Schools, debtor plaintiff, and against the Illinois Department of Mental Health and Development Disabilities, defendant, in the sum of $530,680.53. It is so ordered.