In re A AND C ELECTRIC COMPANY, INC., Debtor.

A AND C ELECTRIC COMPANY, INC., Plaintiff,

v.

MEADE ELECTRIC COMPANY, INC., Defendant.

Bankruptcy No. 96 B 16749.
Adversary No. 96 A 01145.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

April 11, 1997.

Richard Fimoff and David Argentar, Robins, Salomon & Patt, Sara E. Cook, McKenna, Storer, Rowe, White & Farrug, Chicago, IL, for Plaintiff.

Lawrence Fisher and Timothy Casey, Gardner, Carton & Douglas, John C. O'Rourke, Jr., O'Brien, O'Rourke & Hogan, Chicago, IL, for defendant.

## MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

This adversary proceeding relates to the case filed by A and C Electric Company, Inc. ("A & C") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, on August 15, 1995 ("Petition Date"), in which A & C's plan has been confirmed. This adversary proceeding was commenced on August 20, 1996, by A & C against defendant Meade Electric Company, Inc. ("Meade"). It seeks judgment requiring Meade to turn over to A & C the balance of certain proceeds that Meade has in its possession and to which Meade asserts a right of recoupment. Plaintiff sued for $181,345.81, plus interest, computed as the net of its claim for $193,000 less $11,650.19 tendered by Defendant to it. Plaintiff seeks a declaration that Meade's asserted recoupment rights were discharged or limited under the confirmed Plan and claims that the $193,000 is a fund belonging to it. The parties have cross-moved for summary judgment. For reasons stated below, Plaintiff's motion is denied and Defendant is found to be entitled to assert recoupment, but the undetermined issue of the amount it can claim prevents entry of judgment at this time.

### Undisputed Facts

The following undisputed facts emerge from the pleadings and summary judgment filings under Local Bankruptcy Rule 402.M and N:

1. A & C is an Illinois corporation engaged in the business of electrical contracting, with its principal place of business at 2049 Greens Court, Hoffman Estates, Illinois.

2. Meade is an Illinois corporation engaged in the business of electrical contracting, with its principal place of business at 710 Quail Ridge Drive, Westmont, Illinois.

3. On or about February 24, 1994, A & C entered into a subcontract ("Subcontract") with Meade for the performance by A & C of certain electrical construction work on the United States Postal Service facility in Chicago, Illinois ("PO Project"). Meade was a subcontractor of the general contractor, which was a joint venture consisting of The George Hyman Construction Co. and Power Contracting & Engineering Corp. ("General Contractor"). The PO Project is owned by the United States Postal Service ("Owner").

4. While performing the Subcontract, A & C performed certain work and incurred certain costs which A & C asserts were outside of the work required by it under the Subcontract. Accordingly, it submitted a claim ("Extras Claim") for such work and costs to Meade. Meade in turn submitted the Extras Claim with its mark-up to the General Contractor which in turn submitted it to the Owner. At the time the Extras Claim was submitted, the General Contractor and/or the Owner disputed Meade's right to payment therefor.

5. By letters dated June 26, 1995 and July 13, 1995, A & C notified Meade that it was having financial difficulties and that unless an agreement was reached to provide financial accommodations to A & C by July

14, 1995, A & C would not be able to complete its obligations under the Subcontract.

6. By letter dated August 8, 1995, Meade informed A & C that Meade would pay certain vendors of A & C but would not otherwise assist A & C.

7. On August 15, 1995, A & C filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Prior to the filing, A & C ceased work on the PO Project and did not complete its obligations under the Subcontract.

8. On August 18, 1995, Meade informed A & C that A & C was in default under the Subcontract and that if the defaults were not cured within three days, Meade would complete A & C's work with its own manpower. A & C was also informed that Meade would use the unpaid balance of the Subcontract funds to complete A & C's work. Lastly, A & C was notified that any excess funds would be remitted to A & C and that Meade would require A & C to satisfy any shortfall.

9. By letters dated August 29, 1995, September 8, 1995 and September 15, 1995, Meade informed A & C of the status of Meade's completion of A & C's obligations under the Subcontract. Invoices for Meade's services were also sent to A & C.

10. On January 5, 1996 and May 6, 1996, monthly statements of the hours spent by Meade completing A & C's obligations under the Subcontract were transmitted to A & C with back-up.

11. On March 22, 1996, Meade filed in the related bankruptcy case its proof of claim in the amount of $227,925, as an unsecured non-priority claim for the total of expenses incurred to that date and its estimate of the cost to be incurred in the future to complete A & C's portion of the PO Project.

12. On the summary attached to its proof of claim, Meade set forth that the basis for the claim was back charges to A & C for Meade to complete and correct A & C's work on the PO Project.

13. On or about April 21, 1996, Meade completed performance of A & C's portion of the PO Project.

14. During the pendency of the bankruptcy, representatives of A & C participated in a meeting with representatives of the General Contractor, the Owner and Meade regarding the payment of the Extras Claim, among other things.

15. Meade now claims in its motion papers that the total cost of completing and correcting A & C's work on the PO Project was actually $234,783.96.

16. The Subcontract provided, in paragraph 3(d):

Contractor [Meade] may withhold amounts otherwise due under this Subcontract or any other agreement between the parties to cover Contractor's reasonable estimate of any costs or liability contractor has incurred or may incur for which Subcontractor [A & C] may be responsible under this Subcontract or any other agreement between the parties. Appropriate adjustments to withholdings shall be made when the exact amounts owed are determined.

17. The Subcontract provided, in paragraph 9(a):

In case of termination for default, Subcontractor shall not be entitled to receive any further payment until the work shall be fully completed and accepted by the Owner and payment in full made by the Owner. At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by Contractor including overhead and profit, such excess shall be paid by Contractor to Subcontractor. If such amount shall exceed such unpaid balance, the Subcontractor shall pay Contractor the difference on demand.

18. On January 31, 1996, A & C filed its proposed Plan of reorganization.

19. On February 29, 1996, the court entered an order approving the adequacy of A & C's disclosure statement, fixing the time for filing acceptances or rejections to the Plan and directing that the Plan, disclosure statement and a ballot be served on creditors and other parties in interest.

20. Under the proposed Plan, disputed accounts receivable were to fund the Plan upon receipt of payment, but the disclosure statement informed creditors at page 2 that

272

[t]he balance of the accounts receivable are partially in negotiation and partially in suit.

21. On page 8 of the disclosure statement in reference to A & C's accounts receivable, it was further emphasized that "[m]ost of these accounts were in dispute either as to liability or amount, and in some cases they were the subject of litigation."

22. On page 12 of the Disclosure Statement it was further disclosed that

[i]t is anticipated that from the gross proceeds due to the Debtor on certain accounts, there will be deducted Claims of subcontractors and material suppliers that hold valid and enforceable mechanic's lien rights. The payment of these Claims secured by mechanic's lien rights will reduce the net recovery to the Debtor but will also reduce in like amount the amount of unsecured Claims against the Debtor.

23. On page 9 of the disclosure statement, it was stated that, "[a]fter the filing of this case, the Debtor obtained Bankruptcy Court permission to continue to pursue the collection of its prepetition accounts, and it has actively done so."

24. Paragraph 7.3 of the Plan as ultimately confirmed provided in part that "The Debtor's assets, as provided herein, shall be liquidated as follows: (A) Some of the Debtor's causes of action/accounts receivable are the subject matter of existing litigation. The Reorganized Debtor shall vigorously prosecute all causes of action/accounts receivable in the manner most likely to produce the greatest net recovery possible ... (C) The Reorganized Debtor may, in its reasonable business judgment, compromise and settle causes of action/accounts receivable."

25. Neither the Plan nor the disclosure statement stated that any creditor was to be barred from asserting a right of recoupment brought by A & C against such creditor. Moreover, neither document disclosed to creditors that A & C had left the job with Meade and that Meade had asserted in prior

communications its right to be paid out of money from the owner for work done by it to complete the A & C contract.

26. On March 25, 1996, Meade filed its ballot accepting the Plan. Meade did not object to confirmation of the Plan or to any of its terms.

27. By memorandum dated April 9, 1996, the Owner notified the General Contractor, *inter alia,* that "A and C Electric shall receive an additional One Hundred Ninety Three Thousand Dollars and No/Cents ($193,000) (as described in the attached work sheet)." A & C tendered a copy of the memorandum to the court on April 10 in response to the Court's question as to sources of funding for the Plan.

28. Also on April 10, A & C filed a status report on A & C's pre-petition accounts receivable which identified in footnote 5 the Extras Claim as an account receivable of A & C. The April 10 status report was not served on creditors.[1]

29. On May 8, 1996, the Plan was confirmed.

30. On July 16, 1996, Meade received a progress payment from the Owner and General Contractor in settlement for various claims for extras which included the Extras Claim. Meade asserts that the check was in the amount of $578,244, which included the $193,000 that Plaintiff originally claimed due it.

31. On July 29, 1996, Meade issued a check to A & C in the amount of $11,650.19, representing the balance Meade asserts is due A & C after recoupment by Meade of its costs to complete A & C's obligations under the Subcontract. Therefore, Plaintiff's claim herein has been reduced to $181,349.81.

### JURISDICTION

Subject matter jurisdiction lies under 28 U.S.C. §§ 1334 and 157. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(E) and (I). Venue is appropriate pursuant to 28 U.S.C. § 1409(a).

---

1. It was represented at the confirmation hearing, based on the April 8 owner's memorandum, that the payment of $193,000 balance due under the contract to A & C would be received by it, but the prior communication from Meade to A & C specifying Meade's claims against monies to be received from the owner were not disclosed at that hearing.

## SUMMARY JUDGMENT

Summary judgment motions are governed by Fed.R.Civ.P. 56(c) and made applicable to bankruptcy proceedings under Fed. R.Bankr.P. 7056. Summary judgment is granted to avoid unnecessary trials when there are no genuine issues of material fact in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The moving party in a motion for summary judgment has the initial burden of demonstrating that there are no genuine issues of material fact and that judgment in its favor should be granted as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). An issue of material fact will prevent summary judgment if the issue is outcome determinative under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## DISCUSSION

■ Recoupment is an equitable remedy which allows a defendant to reduce the amount of a plaintiff's claim by asserting that there are funds due to it from the plaintiff which arose out of the same transaction. *In re Klingberg Schools,* 68 B.R. 173, 178 (N.D.Ill.1986), *aff'd,* 837 F.2d 763 (7th Cir. 1988); *In re Clowards, Inc.,* 42 B.R. 627, 628 (Bankr.D.Idaho 1984). It is a nonbankruptcy common law doctrine established through precedent which is not codified in the Bankruptcy Code. *In re Flagstaff Realty Associates,* 60 F.3d 1031 (3rd Cir.1995).

■ Recoupment is a mechanism by which a party may calculate the proper amounts due from it by offsetting obligations which arise from the same transaction and which are essentially a defense to the debtor's claim. The essential element for recoupment is that the debts must arise from the same transaction. *In re Heffernan Memorial Hospital District,* 192 B.R. 228, 230 (Bankr.S.D.Cal.1996).

■ "The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on set-off in bankruptcy would be inequitable." *Klingberg Schools,* 68 B.R. at 178 (*citing Lee v. Schweiker,* 739 F.2d 870 (3rd Cir.1984)).

■ Illinois courts view recoupment as a mitigation of damages. *Olin Mathieson Chemical Corp. v. J.J. Wuellner & Sons, Inc.,* 72 Ill.App.2d 488, 492, 218 N.E.2d 823, 825 (1966) (*citing Stow v. Yarwood,* 14 Ill. 424). *See also In re Pyramid Energy, Ltd.,* 160 B.R. 586, 590–91 (Bankr.S.D.Ill.1993).

■ Recoupment is different from set-off because recoupment requires that the same transaction be involved in the debts. The rules of law regarding set-off apply as long as the same parties are involved, but the debts may have arisen from completely different transactions. *Lee v. Schweiker,* 739 F.2d 870, *In re Harmon,* 188 B.R. 421, 424 (B.A.P. 9th Cir.1995). While set-offs are governed and limited by 11 U.S.C. § 553, there is no comparable provision limiting assertion of recoupment rights. *In re Clowards, Inc.,* 42 B.R. 627.

■ The right of recoupment is unaffected by a discharge in bankruptcy and gives priority over other creditors' claims. *Flagstaff Realty Associates,* 60 F.3d at 1035–36; *Brown v. General Motors Corp..* 152 B.R. 935, 938 (W.D.Wis.1993).

■ There is a minority view taken in *In re Kings Terrace Nursing Home and Health Related Facility,* 184 B.R. 200 (S.D.N.Y. 1995), and *In re Izaguirre,* 166 B.R. 484 (Bankr.N.D.Ga.1994), relied upon by A & C, wherein those opinions found that a right to recoupment constitutes a claim under 11 U.S.C. § 101(5) and is therefore dischargeable. That view is misplaced. A "claim" is defined as either a "right to payment" or "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. . . ." In contrast. recoupment is a defense to the amount claimed and, in this case, is an assertion of right against funds received from the owner. While recoupment may rest on events that could give

rise to a breach of contract (and could warrant a claim against the bankruptcy estate such as Meade filed here), it is a remedy conceptually different from breach of contract and may require different proofs. But however viewed, Meade's recoupment right asserted here seeks to recover nothing from the estate and is not asserting a "right to payment" from the Debtor.

■■■ A & C also suggests that its debt to Meade under the Subcontract and the monies due it for the Extras Claim do not arise from the same transaction and that the recoupment doctrine does not, therefore, apply. In this it is incorrect. Several cases are instructive. In *Klingberg Schools*, 68 B.R. at 179–80, the court analyzed the contract between the parties to determine if certain overpayments by the creditor constituted a legitimate recoupment. When it appeared that the creditor's rate reduction that led to the alleged overpayment was actually violative of the terms of the contract in issue, the court held that the creditor was not entitled to the recovery it sought.

Similarly, in *Flagstaff Realty Associates*, 60 F.3d 1031, the court looked to the lease between a debtor landlord and creditor tenant to determine if monies expended by the tenant pre-petition for necessary repairs could be recouped from rent due thereafter. The court concluded that the lease clearly provided for a reduction in the rent when the tenant cured the landlord's default. The court also found that the case satisfied the "same transaction" test because the claim for repair costs and the rent arose from the same lease and it would have been inequitable for the landlord to receive rent without compensating the tenant for undertaking the repairs. *Id.* at 1034–35.

Here the Subcontract provided, in pertinent part:

8. *Changes*

(a) Contractor [Meade] may, at any time, unilaterally or by agreement with Subcontractor [A & C], without notice to the sureties, make changes in the work covered by this Subcontract. Subcontractor shall perform the work as changed without delay.

Subsections (b)–(e) provide the procedures for adjustments in price and/or scheduling resulting from changes in the job. It is clear that the Subcontract, like most standard construction contracts, provided for the eventuality that there would be changes to or "extras" on the job. This is the normal course of dealing in the construction industry, where unforeseen circumstances frequently alter the specific work to be performed. The essential parameters of reimbursement and payment are provided in the original contract, as are responsibilities and liabilities with respect to insurance coverage and such other matters. In essence, changes or extras are simply an extension of the original contract for work. A & C's argument that the Extras Claim does not arise from the same contract as the costs incurred by Meade in completing the Subcontract does not stand up to scrutiny.

■■■ A & C also argues that Meade is precluded from recovery because it participated in the bankruptcy and never raised its right to recoupment. There is nothing in the Bankruptcy Code that requires a creditor to do so. A & C knew that Meade had asserted in detail prior to Plan confirmation its right to recover from forthcoming owner payments for the work it had performed that A & C had undertaken responsibility for. A & C knew how the payment process worked and knew that Meade would be paid by the owner and that A & C would have to obtain payment from Meade. It is disingenuous for A & C to argue that the funds at issue ended up in Meade's possession "fortuitously." The parties' prior course of dealing, the contract right for Meade to withhold from A & C for work done for it by Meade, and Meade's early and frequent letters put A & C on notice that the funds due it would go first to Meade, who would assert a recoupment right against it. A & C had no direct relationship with the General Contractor or Owner, and A & C knew or should have known that Meade would claim a right to recoup its losses from the PO Project. It was not Meade's responsibility to apprise A & C of the law, and it is not now Meade's responsibility to fund A & C's Plan of reorganization.

In the same vein, A & C also makes much of the fact that Meade voted for the plan and that it is therefore estopped from holding funds that A & C intended to use to fund the plan. Yet, the Plan that Meade voted for did not discuss the Extras Claim. Meade is bound by the Plan only to the extent of its proof of claim. If the Owner had never paid the Extras Claim, Meade would have received only its pro rata share of its claim under the Plan to the extent monies were available. Since the Owner did pay the Extras Claim, Meade is now entitled to assert a recoupment right for work it did to complete contracted tasks that A & C did not complete.

Under ¶¶ 2(d) and 9(a) of the subcontract, however, the amount of the recoupment claim remains to be adjudicated. The motion papers did not contain affidavits or stipulations showing a basis to calculate to what extent and for what expenses Meade is entitled to claim recoupment. More particularly, it has not been established in detail which tasks A & C failed to perform that it was contractually obligated to perform, and what expenses were necessarily and reasonably incurred by Meade to complete and correct those tasks. These questions must yet be litigated.

### CONCLUSION

For reasons set forth above and by order to be entered, summary judgment will be denied to A & C Electric. Summary judgment cannot be granted to Meade because there remain issues to be litigated to enable determination of how much of a recoupment it is entitled to assert. An appropriate order will be separately entered under which a hearing will be set under Fed.R.Civ.P. 56(d) (Fed.R.Bankr.P.7056) as to whether any parties object to the section of this Opinion entitled "Undisputed Facts" being deemed undisputed for purposes of trial, and a Final Pretrial Order will be entered.