**In re INSLAW, INC., Debtor.**

**INSLAW, INC., Plaintiff,**

v.

**The UNITED STATES of America and the United States Department of Justice, Defendants.**

**Bankruptcy No. 85–00070.**
**Adv. No. 86–0069.**

United States Bankruptcy Court,
District of Columbia.

July 31, 1987.

Charles R. Work, Stephen P. Murphy, M.E. Friedlander, McDermott, Will & Emery, Philip L. Kellogg, Kellogg, Williams and Lyons, Washington, D.C., for plaintiff.

Dean S. Cooper, J. Christopher Kohn, Lauren Bloom, Sandra Spooner, Dept. of Justice, Civ. Div., Commercial Litigation Branch, Washington, D.C., for defendants.

## OPINION ON DENIAL OF DEFENDANTS' MOTION TO DISMISS

GEORGE F. BASON, Jr., Bankruptcy Judge.

This opinion explains why the Court has by separate Order denied the motion of defendants United States of America and United States Department of Justice (collectively "DOJ" or "the Government") to dismiss the adversary proceeding advanced by plaintiff/debtor-in-possession Inslaw, Inc. ("Inslaw").

The Court's holding at this stage of this litigation is necessarily narrow. I am bound by the hornbook rule, as expressed in *Ammerman v. Miller*, 432 F.2d 621, 626 (D.C.Cir.1970), citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957), that a complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." As stated in *In re Mercon Industries, Inc.*, 37 B.R. 549, 550–51, n. 1 (Bankr.E.D.Pa.1984), a motion to dismiss can be granted "only if it appears certain that the plaintiff is entitled to no relief under any statement of facts which could be proved in support of the claim."

### FACTUAL BACKGROUND

Inslaw is the corporate successor in interest to the Institute For Law and Social Research, a non-profit corporation founded during the 1970's to develop computerized management support systems for law enforcement agencies. Inslaw was formed in 1981 to continue work previously pursued by the Institute, including the development and maintenance of a computerized case management system known as the Prosecutor's Management Information System ("PROMIS"). According to the allegations of the complaint, Inslaw developed over one thousand separate improvements to the PROMIS system, most of which were funded entirely from private funds, to generate an "Enhanced PROMIS" which is superior to the "old PROMIS" in terms of speed, flexibility, ease of use, breadth of function, and ability to be modified for particular local needs.

In March 1982, Inslaw was awarded a contract by DOJ to implement and install Enhanced PROMIS in various United States Attorneys Offices. Inslaw alleges that, commencing almost immediately and continuing throughout its contract performance, Inslaw was subjected to harassment by DOJ; that disputes arose, none of which were resolved; and that DOJ ultimately terminated a portion of its contract with Inslaw for the convenience of the Government.

The complaint alleges a truly outrageous course of conduct over a period of years by DOJ (including high officials of DOJ) against Inslaw, which has resulted in DOJ's improper acquisition and exercise of control over Inslaw's corporate lifeblood— that is, its valuable enhancements to PROMIS. I must accept these allegations as true for purposes of the Government's motion.

The Department of Justice is of course that department of the Executive Branch of our Government that has particular responsibility concerning the Constitutional mandate to "take care that the Laws be faithfully executed."[1] A charge that the very guardians of the rule of law themselves have engaged and are engaging in a course of deliberate law-breaking must be scrutinized most carefully and, if proved, must and will be condemned most severely. Ours is a Government *under law*.

According to the complaint:

(1) DOJ acquired Inslaw's trade-secret enhancements to PROMIS by means amounting to trickery, fraud and deceit. (Complaint at paragraphs 9–20);

(2) "DOJ has refused to make compensation and continues to utilize INSLAW's

---

1. United States Constitution, Article II, Section 3.

property [consisting of trade secret enhancements, which pursuant to 11 U.S.C. Section 541, automatically become property of the bankruptcy estate immediately upon the filing of Inslaw's bankruptcy petition, and which thus under 11 U.S.C. Section 362(a)(3) become subject to protection against "any act ... to exercise control over property of the estate"] while disparaging [such property], publicly calling into question Inslaw's ownership of it, and threatening to render it valueless by disclosing the enhancements to third parties" (Complaint at paragraph 5);

(3) DOJ, through its employees, withheld funds "to the point where in excess of one million dollars crucial to INSLAW's operations were withheld without justification. [DOJ] knew or should have known ... that the cumulative effect of those actions would be to force INSLAW into bankruptcy and possibly liquidation" (Complaint at paragraph 22);

(4) DOJ asserted a sham claim against INSLAW "as a pretext to avoid meaningful negotiations on INSLAW's claim, advancing it as an offset to avoid DOJ's obligation to make payment of sums due and owing to INSLAW" and to gain an improper advantage in the bankruptcy (Complaint at paragraph 26);

(5) DOJ has continued its deliberate and willful interference with INSLAW's business operations after forcing INSLAW into Chapter 11 bankruptcy and is now hindering INSLAW's efforts at reorganization (Complaint at paragraphs 21–33);

(6) Overall, DOJ has engaged in a course of conduct which strongly suggests personal vindictiveness by DOJ officials, including a discharged INSLAW employee who was placed in charge of the implementation of the INSLAW/DOJ contract (*see*, generally, Complaint at paragraphs 7, 17, 22–25, and 30); and

(7) "DOJ has caused INSLAW to sustain injuries including but not limited to loss of revenue, loss of contract renewals, loss of company staff, loss of client base, loss of reputation, loss of opportunity to develop an improved product, and loss of joint product development and marketing contracts with significant prospective clients and to suffer humiliation and embarassment" (Complaint at paragraph 37).

The complaint is styled in four counts. Count One seeks a declaratory judgment with respect to Inslaw's ownership of the enhancements to PROMIS; Count Two seeks a declaratory judgment with respect to the occurrence of certain violations of the automatic stay imposed by 11 U.S.C. Section 362(a); by Count Three, Inslaw seeks to enjoin DOJ from further violations of the automatic stay; by Count Four, Inslaw seeks over thirty million dollars in damages for DOJ's past violations of the automatic stay.

This Court has concluded that defendants' motion to dismiss Counts One, Two and Three of the complaint should be denied. This Court reserves decision with respect to defendants' motion to dismiss Count Four until after trial of issues raised by the first three Counts.[2]

## ANALYSIS

As an initial proposition, I disagree with defendants' characterizations of Inslaw's claims. Inslaw's claims are grounded squarely in bankruptcy law; Inslaw seeks relief for violations of the automatic stay imposed by Section 362(a) of the Bankruptcy Code.

## I. THE AUTOMATIC STAY

The automatic stay is one of the most fundamental protections afforded to a

---

**2.** The opinion of the Fourth Circuit Court of Appeals in *Budget Service Co. v. Better Homes of Va., Inc.,* 804 F.2d 289 (4th Circ.1986) was reported after my Order was issued but before this Opinion explaining the reasons for the Order. Based on the authority of that case, and for reasons touched upon in this Opinion, I can at this time see no reason to grant the motion to dismiss Count Four. There is, however, good reason to bifurcate the trial of this case. I will therefore adhere to my ruling to reserve decision concerning Count Four. The parties will thus have a further opportunity to focus on that matter if and when the need arises.

bankrupt entity.[3] The legislative history emphasizes this point:[4]

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

In addition:[5]

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pressure their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

Professor Frank R. Kennedy, a leading scholar on bankruptcy law, points out that, when Congress first enacted automatic stays in the Chandler Act in 1938, "Congress thus recognized that continuation of the debtor's enterprise during the pendency of the reorganization case was crucial to any realistic hope for rehabilitation." Kennedy, "Automatic Stays Under the New Bankruptcy Law," 12 U.Mich.J.L.Ref. 1, 4 (1978).

The courts uniformly have recognized and given effect to the importance of the automatic stay. *In re Tringali*, 796 F.2d 553, 562 (1st Cir.1986) (citing and quoting extensively from legislative history and caselaw); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir.1986) ("The purpose of this section [362] by its various subsections is to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor"); *Fidelity Mortgage Investors v. Camelia Builders, Inc.* 550 F.2d 47, 55 (2d Cir.1976), *cert. den.*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) ("The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order

---

3. By a separate ruling, I have determined that Inslaw's claim presents a "core proceeding" within the meaning of 28 U.S.C. Section 157(b). That decision, like this one, is based upon an analysis of the rather straightforward claims for relief as pled in Inslaw's complaint. I am pleased to note that, shortly before my ruling but unbeknownst to me, the Fourth Circuit Court of Appeals reached precisely the same conclusion. *Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir.1986): "We are of opinion and hold that a proceeding to prosecute a violation of the automatic stay is a core proceeding within the meaning of 28 U.S.C. Section 157(b)(1) and (2)."

The full text of Section 362(a) is:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate; (4) any act to create, perfect, or enforce any lien against property of the estate; (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and (8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

4. S.Rep. No. 95–989 (1978), pp. 54–55, U.S. Code Cong. & Admin.News 1978, pp. 5787, 5840, 5841.

5. S.Rep. No. 95–989 (1978), p. 49, U.S.Code Cong. & Admin.News 1978, p. 5835.

to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.")

Among the acts stayed by the commencement of a case by operation of Section 362 is "any act to obtain possession of property of the estate or property from the estate or to exercise control of property of the estate ..." (Section 362(a)(3).) This section protects the debtor and all legitimate creditors by preventing dismemberment of the estate by the acts of *any* entity seeking possession of, or control over, property of the estate. *See* Collier's Bankruptcy Manual, Section 362.03 (1987). It is this section which would be violated by the DOJ's wrongful exercise of control over IN-SLAW's property, as alleged in INSLAW's Complaint.

Congress in its 1984 amendments to the 1978 Bankruptcy Code underscored the importance of the automatic stay by adding subsection (h) to Section 362. Subsection (h) provides for recovery not only of actual damages but also "attorneys' fees, and, in appropriate circumstances ... punitive damages" for "any willful violation" of the automatic stay. *Budget Service Co. v. Better Homes of Virginia, Inc.* 804 F.2d 289, 293 (4th Cir.1986) (where secured creditor "knew of the pending [Chapter 11 bankruptcy] petition and intentionally attempted to repossess the [collateral] vehicles in spite of it," the "bankruptcy court acted within its power in awarding compensatory damages, attorneys' fees and punitive damages to" the debtor corporation under Section 362(h)).

The scope of the automatic stay is "extremely broad." 2 *Collier on Bankruptcy* paragraph 362.04, p. 362–27. "It prohibits, among other things, any act to obtain possession of property belonging to the debtor's estate, any act to collect on a claim against the debtor that arose before the filing in bankruptcy, and any act to set off a debt owing to the debtor that arose before the filing." *United States v. Norton,* 717 F.2d 767, 771 (3rd Cir.1983) (upholding money judgment against IRS for setting off tax refund against tax liability in violation of automatic stay).

In sum, violation of the automatic stay strikes at the heart of the Bankruptcy Code's mechanisms for debtor rehabilitation and for equity amongst creditors; willful violation is an extremely serious matter to be dealt with severely.

## II. SOVEREIGN IMMUNITY DOES NOT INSULATE THE DEFENDANTS AGAINST INSLAW'S CLAIMS.

Defendants argue that Inslaw's claims are barred by sovereign immunity. They allege that claims in bankruptcy against the Government are permissible only if and to the extent that the Government files a proof of claim against the debtor. The argument is centered around an analysis of Subsections (a) and (b) of Section 106 of Title 11, which deal with counterclaims and offset claims, respectively.[6]

This Court of course fully recognizes the well-established rules that, absent a statutory waiver, sovereign immunity stands as an absolute bar to a lawsuit against the Government (*Gilbert v. DaGrossa,* 756 F.2d 1455, 1458 (9th Cir.1985)) and that statutes waiving the Government's sovereign immunity must be "construed strictly in favor of the sovereign." *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 19, 96 L.Ed. 26 (1951). By the same token,

---

**6.** Section 106 in its entirety reads:
(a) A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.
(b) There shall be offset against an allowed claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

(c) Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity—
(1) a provision of this title that contains "creditor," "entity," or "governmental unit" applies to governmental units; and
(2) a determination by the court of an issue arising under such a provision binds governmental units.

however, the Supreme Court has also stated that full effect is to be given to statutes waiving sovereign immunity: "It may be that it is 'novel and unprecedented' to hold the United States accountable for the negligence of its firefighters, but the very purpose of the Tort Claims Act was to waive the Government's traditional all-encompassing immunity from tort actions and to establish novel and unprecedented governmental liability....

"There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it." *Rayonier, Inc. v. U.S.*, 352 U.S. 315, 319, 320, 77 S.Ct. 374, 376, 377, 1 L.Ed.2d 354 (1957) [footnote omitted].

In this instance, there is no question that Section 106 contains an express waiver of sovereign immunity in each of its three subsections. Taken together, they constitute extremely broad waivers of sovereign immunity and have been so construed by numerous courts, as discussed below. The defendants' arguments concerning construction of Section 106 fail for several reasons.

■ First, the filing of a proof of claim is not a prerequisite to a finding of a waiver of sovereign immunity under Section 106(a).[7] *In re Davis*, 20 B.R. 519 (Bankr.

M.D.Ga.1982). The *Davis* court explained its holding by reference both to the "plain language" of the statute[8] and to the legislative history of Section 106(a):

(i) As to Section 106(a)'s plain language: The plain language of Section 106 says nothing about the necessity of a governmental unit filing a proof of claim before there is a waiver of sovereign immunity nor does the definition of 'claim' or 'governmental unit,' Section 101(4)[9] and Section 101(21)[10] respectively, say anything about the necessity of a governmental unit filing a proof of claim before there is a waiver of sovereign immunity.

20 B.R. at 520.

(ii) Far from supporting the Government's position in this case, the legislative history of Section 106(a) positively refutes that position. Thus:

The original version of 11 U.S.C. Section 106 contained such words [waiving sovereign immunity only as to a governmental unit "that files a proof of claim under Section 501 of this title"]. As finally adopted ... the ... portion [requiring the filing of a proof of claim] was eliminated from [sub]section (a) ... and [sub]section (c) was added. What Congress rejected should not be injected.

20 B.R. at 521. The holding in *Davis* corroborates Professor Kennedy's position on the issue. He flatly states: "The allowability of neither the counterclaim [under Sec-

---

**7.** This Court agrees with the Government that Section 106(b)'s waiver of sovereign immunity probably applies only if a governmental unit files a proof of claim. That is because Section 106(b) deals with "allowed" claims, and ordinarily a claim cannot be "allowed" by the Court unless and until a proof of claim respecting that claim has been filed. 11 U.S.C. Sections 501 and 502. *But see* 11 U.S.C. Section 1111(a).

**8.** The "plain language" rule is of course hornbook law. Thus: "Absent a clearly expressed legislative intention to the contrary [the] language [of the statute itself] must ordinarily be regarded as conclusive." *Consumer Product Safety Comm. v. GTE Sylvania, Inc.* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). And: "... a statute must be interpreted according to its plain language unless a clear contrary legislative intention is shown ..." *Alabama v. Marshall*, 626 F.2d 366, 368–369 (5th Cir.1980).

**9.** 11 U.S.C. Section 101(4) states: "claim" means —(A) right to payment, whether or not such

right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**10.** Former 11 U.S.C. Section 101(21), now Section 101(26), states: "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

tion 106(a) ] nor the offset [under Section 106(b) ] depends on the filing of a proof of claim by the governmental unit, as had been required under the earlier version of section 106(a), (b), passed by the House and Senate." Kennedy, "Automatic Stays Under The New Bankruptcy Code," 12 U. Mich. J.L. Ref. 1, 30, fn. 120 (1978).

■ Two other reasons exist for rejecting the Government's contention that subsections 106(a) and (b) require a formal proof of claim to be filed before sovereign immunity is waived:

(i) Under settled bankruptcy law, a creditor that has failed to file a formal proof of claim, but has filed other papers or made representations to the bankruptcy court (or to the bankruptcy trustee or debtor-in-possession),[11] stating the nature and amount of its claim and evidencing an intent to hold the debtor liable, is considered to have submitted an "informal proof of claim." That creditor can then become entitled to have its claim "allowed" by the Court and hence to be paid a distributive share, if the creditor later files a formal proof of claim— even after the time for filing a formal proof of claim has expired. *In re Anderson-Walker Industries, Inc.,* 798 F.2d 1285 (9th Cir.1986); *Fausett v. Murner,* 402 F.2d 961 (5th Cir.1968); *In Re Gibraltar Amusements, Ltd.,* 315 F.2d 210 (2d Cir.1963).

In this instance, and based on the record of the *Inslaw* case, the court must conclude for purposes of this motion that DOJ has filed papers and made representations both on the record before this Court and with the debtor-in-possession that would qualify as an informal proof of claim. The Government should not be permitted to defeat Inslaw's claim against it on the ground that it has not filed a formal proof of claim and hence has not waived sovereign immunity,

and then later be able to obtain a distribution from Inslaw's assets by perfecting its already-asserted informal proof of claim. Such a result would offend equity and conscience. "Fairness requires that a governmental unit cannot make an informal or incomplete claim to protect its right to share in subsequent distribution and also assert sovereign immunity." *In re Davis,* 20 B.R. 519, 523 (Bankr.M.D.Ga.1982).

(ii) Since this Court must conclude for purposes of the motion to dismiss that DOJ has already asserted an informal proof of claim, the requirement that this Court believes to exist under subsection 106(b) [12]—that a proof of claim must appear on the record before sovereign immunity is waived [13]—is met in this instance. *In re Davis,* supra, 20 B.R. at 522–523 and cases cited therein.

■ Finally, and of prime importance concerning waiver of sovereign immunity, Inslaw's claims are grounded not only in the waivers of sovereign immunity established by subsections (a) and (b); they are also grounded in subsection (c), a separate and distinct waiver. Indeed, three of the cases cited by the Government in support of its position as to subsection (a) or (b) help to establish that subsection (c) does, in fact, permit suit against the Government: (i) *In re Maytag Sales & Service, Inc.,* 23 B.R. 384 (Bankr.W.D.Ga.1982), (ii) *In re Community Hospital of Rockland County,* 15 B.R. 785 (Bankr.S.D.N.Y.1981), and (iii) *In Re Remke, Inc.* 5 B.R. 299, 302 (Bankr.E.D.Mich.1980). They hold that, while subsections (a) and (b) each provides an independent basis for jurisdiction over the Government, neither of them precludes an exercise of jurisdiction over the Government pursuant to the separate and distinct

---

**11.** *See* 11 U.S.C. Section 1107(a).

**12.** And the similar requirement that DOJ asserts (and some Courts have held) exists under subsection 106(a). Some of those courts appear to have been misled by the legislative history relating to the earlier, superseded versions of subsection (a) and (b), which (as explained by the *Davis* court, 20 B.R. at 521) did indeed require the filing of a proof of claim. *See, e.g., In re*

*Lawson Burich Assn., Inc.* 59 B.R. 681, 689, 14 B.C.D. 354, 360 (Bankr.S.D.N.Y.1986), relying on this superseded legislative history to conclude, erroneously, that "Section 106 as a whole was intended to provide a rather 'limited' waiver of sovereign immunity."

**13.** See footnote 7 above.

waiver of sovereign immunity contained in subsection 106(c).[14] Thus:

(i) *In re Maytag Sales & Service, Inc.* 23 B.R. 384, 389 (Bankr.W.D.Ga.1982), holds:

... not only does a governmental unit lose the protection of the doctrine of sovereign immunity by asserting a claim against the estate but '[e]ven if the rights of a governmental unit are not asserted, section 106(c) authorizes the trustee to recover avoidable transfers from governmental units.' Collier Bankruptcy Manual Section 106.04 (3d ed. 1982).

(ii) Similarly, *In re Community Hospital of Rockland County*, 15 B.R. 785, 789–790 (Bankr.S.D.N.Y.1981), holds:

The Government argues that subsection (c) of Code Section 106 does not waive sovereign immunity for an action under Code Section 547 unless the requirements of subsection (a) and (b) are met, i.e., that the Government files a proof of claim, which was not done in this case. Hence, the Government reasons that the word "creditor" in Code Section 547 applies to the Government only if a proof of claim has been filed, because any other construction would render the "except as provided" language of subsection (c) meaningless. This argument lacks persuasiveness. It is evident that when the Government files a claim subsections (a) and (b) of Code Section 106 provide for a limited waiver of sovereign immunity with respect to the estate's counterclaims and offsets. Such counterclaims and offsets need have no relationship to the trustee's avoiding powers and may be bottomed on non-bankruptcy statutory or common law

rights which could not otherwise form the basis for a lawsuit against the Government because of the sovereign immunity doctrine....

However, subsection (c) of Code Section 106 was intended to permit a trustee or debtor-in-possession to assert the avoiding powers found in the Bankruptcy Code against a governmental unit. Thus, the use of the terms "creditor", "entity" or "governmental unit" are to be applied interchangeably with respect to the Government's amenability to the avoiding powers, notwithstanding any assertion of sovereign immunity....

There is no language in subsection (c) requiring the Government to file a claim as a condition precedent to the waiver of sovereign immunity with respect to the avoiding powers. Therefore this Court will not include language that Congress saw fit to exclude.

It should be noted that it appears that more than half the funds that were collected by IRS were received after the commencement of the Chapter 11 case, and in violation of the automatic stay under Code Section 362(a).

(iii) And *In re Remke, Inc.*, 5 B.R. 299 (Bankr.E.D.Mich.1980), holds:

By virtue of section 106, as enacted, a governmental unit is deemed to have waived its defense of sovereign immunity, not only in cases in which the government has filed a claim, as provided for in subsections (a) and (b), but also in cases covered by subsection (c)....

In light of the inclusion of subsection (c) in section 106 and the accompanying ... legislative history, the government's

---

**14.** Other cases cited by the Government similarly do not support the Government's motion. *Merritt Commercial Sav. & Loan, Inc. v. Guinee*, 766 F.2d 850 (4th Cir.1985), and *In re Braniff Airways, Inc.*, 42 B.R. 443 (Bankr.N.D.Texas 1984) were confined to analysis of subsection (b) of Section 106 and did not address subsection (c) at all. *In re Theobald Industries, Inc.*, 53 B.R. 506 (Bankr.D.N.J.1984), *In re Ramos*, 12 B.R. 250 (Bankr.N.D.Ill.1981), and *In re Regal Construction Co.*, 18 B.R. 353 (Bankr.D.Md. 1982), all involved claims against state agencies, which the courts held were barred by the Eleventh Amendment. Those cases present issues of federal-state relations that are entirely absent here. Indeed, in *In re Crum*, 20 B.R. 160, 161 (Bankr.D.Idaho 1982), the court, after upholding a state agency's Eleventh Amendment defense, specifically declined to decide "the related but legally distinct issue of common law sovereign immunity." *In re Berger*, 16 B.R. 236, 237, 8 B.C.D. 796, 797 (Bankr.S.D.Fla.1981), construes only Section 106(a) and makes no mention of Section 106(c), and its decision is premised on a specific provision of 42 U.S.C. Section 1395ff that (so it was held) "precludes judicial review" of the administrative-agency decision there involved.

contention that a governmental unit's defense of sovereign immunity is waived only in cases in which the government has filed a proof of claim, is without merit. To construe section 106 as urged by the government, would read subsection (c) out of the Bankruptcy Code. There is no justification for so doing. [Footnotes omitted.]

The "plain language" [15] of Section 106(c), its legislative history, the commentators, and all the decided cases require a holding that the sovereign immunity of a governmental unit is waived with respect to a proceeding where the debtor seeks relief under a provision of the Bankruptcy Code, such as Section 362, that contains one of three "trigger words"—"creditor," "entity," or "governmental unit." This is so because (i) section 106(c) clearly provides that "a provision of [Title 11] that contains the term 'creditor,' 'entity,' or 'governmental unit' applies to governmental units"; (ii) section 362, by its express terms, is "applicable to all entities"; and (iii) by definition, "'entity' includes ... governmental unit ..." 11 U.S.C. Section 101 (14).

As the legislative history to Section 106 explains:

"With respect to ... the application of the automatic stay, to governmental actions, this section and the other sections mentioned are intended to be an express waiver of sovereign immunity of the Federal government."

H. Rep. No. 595, 95th Cong., 1st Sess. 342, U.S.Code Cong. & Admin.News 1978, p. 6299.

The legislative statements explaining the new subsection (c) state in identical language: [16]

Section 106(c) relating to sovereign immunity is new. The provision indicates that the use of the term "creditor," "entity," or "governmental unit" in title 11 applies to governmental units notwithstanding any assertion of sovereign immunity and that an order of the court binds governmental units. The provision

is included to comply with the requirement in case law that an express waiver of sovereign immunity is required in order to be effective.

Professor Frank Kennedy notes that, "[a]lthough more guardedly drafted, section 106[c] comes close to adopting the broad provision for general applicability of the bankruptcy laws to the federal or state government that had been recommended by the Commission on the Bankruptcy Laws." Kennedy, "Automatic Stays Under the New Bankruptcy Law," 12 U. Mich. J.L. Ref. 1978. Or, as 2 *Collier on Bankruptcy* paragraph 106.04, pp. 106–8—106–10 puts it:

Since these [three trigger-word] terms appear in many operative provisions of the Code, the extent of this statutory waiver of sovereign immunity [in Section 106(c) ] is significant....

... section 106(c) does not require a filing of proof of claim.

.... section 106(c) is as broadly applicable as would be expected from the language employed ...

A number of decisions by United States Courts of Appeals have construed Section 106(c) consistently with its broad language. *McVey Trucking, Inc. v. Secretary of State of Illinois (In re McVey Trucking, Inc.)*, 812 F.2d 311 (7th Cir.1987) (Congress has authority under Bankruptcy clause to create a cause of action against states for turnover of preferential payments; neither the Eleventh Amendment nor sovereign immunity creates a limitation on this Article I plenary power); *In re Vazquez, Guerrero & Compton*, 788 F.2d 130 (3rd Cir.1986) (neither the Eleventh Amendment nor sovereign immunity bars debtors' Bankruptcy-Code-based claims for money judgments against state welfare department); *Lee v. Schweiker*, 739 F.2d 870, 873 (3d Cir.1984) (sovereign-immunity defense rejected and debtor held entitled to recover amounts withheld from social security benefit checks in violation of Section 362's automatic stay); *Gardner v. Pa. Dept. of Pub-*

---

**15.** *See* footnote 8, *supra.*

**16.** 124 Cong.Rec.H 32,394 (Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec.S 33,993 (Oct. 5, 1978) (statement of Sen. DeConcini).

*lic Welfare,* 685 F.2d 106 (3rd Cir.), *cert. den.,* 459 U.S. 1092, 103 S.Ct. 580, 74 L.Ed.2d 939 (1982) (Eleventh Amendment and sovereign-immunity defenses rejected and state welfare· department judgment liens avoided); *In re Neavear,* 674 F.2d 1201, 1204 (7th Cir.1982) ("... we hold that section 106(c) of the Bankruptcy Code waives the sovereign immunity of the United States with respect to questions relating to the dischargeability of debts owed to the government"). In short, the Federal Government does not have sovereign immunity with respect to claims, such as those asserted by Inslaw in Counts One, Two and Three, that are commenced under any provision of Title 11 that is applicable to a "creditor" or "entity" or "governmental unit." *In re Davis,* 20 B.R. 519 (Bankr. M.D.Ga.1982).

At one point DOJ apparently acknowledges (or at least comes close to acknowledging) that sovereign immunity does not insulate it against issuance of relief "of an injunctive or declaratory nature" under Section 106(c).[17]

However, later in the same memorandum [18] DOJ makes two rather creative arguments. The first is that because DOT-CAB [19] and the Claims Court are "without authority to issue injunctive and declaratory relief regarding a Government contract", therefore "[t]his Court likewise has no jurisdiction to grant declaratory or injunctive relief ..." This argument is surprising. It simply ignores the crucial fact that the broad waivers of sovereign immunity that Congress explicitly placed in the Bankruptcy Code are distinct, separate and independent from and in addition to the rather limited waiver found in the Tucker Act.[20] Moreover, as developed more fully

in Part III below, contrary to the Government's later argument, Inslaw's claims in this Court are not "disguised contract claims." They are claims for tortious conversion of the property of the estate in violation of the Bankruptcy Code's automatic stay, 11 U.S.C. Section 362(a)(3).

Thus, the one case cited by DOJ for the proposition that this Court cannot "grant declaratory or injunctive relief" is clearly distinguishable. For in that case, the court emphasized that its holding was based on the fact that the injunctive relief sought was "not based on any right provided in the Bankruptcy Code." *In re Pa. Peer Review Organization, Inc.* 50 B.R. 640, 647 (Bankr.M.D.Pa.1985). Cases such as *Lee v. Thornton,* 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975); *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973), and *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), dealing with limitations imposed on the Claims Court and by analogy on District Courts by the Tucker Act, are simply irrelevant. The fact that DOTCAB and the Claims Court are prohibited by their governing statutes and regulations from issuing injunctive or declaratory relief concerning contract claims is totally beside the point, when the question is the scope of *this* Court's powers, under a *different* statute, concerning *different* kinds of claims. *See Megapulse, Inc. v. Levine,* 672 F.2d 959, 966–969 (D.C.Cir.1982).

DOJ's other creative and surprising argument is based on the same faulty premise. DOJ argues that because the Federal Tort Claims Act ("FTCA") excepts from its scope claims arising out of libel, slander, misrepresentation, interference with contract rights, and abuse of discretion by

---

17. "Memorandum of Points and Authorities in Support of Motion to Dismiss," filed July 25, 1986 ("Memorandum"), p. 10: "... subsection 106(c) subjects governmental units to bankruptcy jurisdiction when the court acts pursuant to a specific grant of authority where relief of an injunctive or declaratory nature can be imposed or when the dispute arises within the bankruptcy court's *in rem* jurisdiction.... If [however] they do not file a proof of claim, sovereigns have their sovereign immunity protection from liability for monetary damages intact."

18. Memorandum, pp. 17–19.

19. Department of Transportation Contract Appeals Board, the administrative agency with jurisdiction over contract disputes between Inslaw and DOJ.

20. 28 U.S.C. Section 1491, waiving sovereign immunity and granting jurisdiction to the Claims Court to award money damages against the Government on contract claims.

government officers (see *Art-Metal-USA, Inc. v. United States*, 753 F.2d 1151 (D.C. Cir.1985)), therefore "clearly this Court cannot have greater authority than is possessed by the district court on FTCA claims." Once again DOJ has simply ignored the fact that the Bankruptcy Code's explicit waivers of sovereign immunity are entirely distinct, separate and independent from and in addition to those found in any other statute, including the FTCA. The exceptions set forth in the FTCA are not repeated in the Bankruptcy Code. Hence, those exceptions simply do not apply when suit is brought under a substantive provision of the Bankruptcy Code containing one of Section 106(c)'s three trigger words.[21]

Finally as to the sovereign immunity defense, DOJ mounts an ingenious but ultimately unpersuasive argument to the effect that Section 106(c) leaves the Government's sovereign immunity intact as to claims for monetary damages. (This argument of course does not affect Counts One, Two and Three of Inslaw's complaint, which seek declaratory and injunctive relief.) The argument is:[22]

The opening subordinate clause of subsection 106(c), "except as provided in subsections (a) and (b) of this section," expressly prevents subsection 106(c) from expanding a governmental unit's liability for money judgments or setoffs beyond that provided in the excepted subsections.

The first difficulty with DOJ's proposed statutory interpretation is that it simply makes no sense. DOJ suggests no conceivable reason, nor can this Court imagine any reason, why Congress, having decided to add subsection (c) and thus to allow debtors to assert Bankruptcy-Code-based claims against governmental entities, would want to provide *less* rights to those debtors for those claims than it had already provided to debtors for non-Bankruptcy-Code claims, under (a) in the case of compulsory counterclaims and under (b) in the case of setoffs. The argument appears to proceed on the premise that a compulsory counterclaim to a claim for money must also be for a "money judgment," and therefore, since only a money judgment is allowed under (a), only a *non*-monetary judgment is allowable under (c). That premise is not true. Rule 13(c), F.R. Civ. P. (incorporated by Bankruptcy Rule 7013), specifically provides: "[A counterclaim] may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party."

The second difficulty with DOJ's argument is that there is virtually no authority to support it. DOJ cites only one case, *In re Lawson Burich Assn., Inc.*, 59 B.R. 681, 14 B.C.D. 354 (Bankr.S.D.N.Y.1986).[23] But

---

21. The law is filled with instances in which the same set of operative facts may support claims based on entirely different legal theories, one of which may be barred by some defense, while the other is not barred. Strict product liability in tort developed in part in response to limitations on contract-based recovery, such as the requirements of privity and warranty. Prosser on Torts (4th Ed. 1971), pp. 655–658. Claims under 42 U.S.C. Section 1983 are permissible, not only where a state-law claim would be ineffective as a legal or practical matter, but where a state-law claim is clearly available. *Wright v. Roanoke Redev. & Housing Auth.*, — U.S. —, —, 107 S.Ct. 766, 774, 93 L.Ed.2d 781, 792 (1987) ("... that tenants may sue on their lease in state courts ... is hardly a reason to bar an action under Section 1983, which was adopted to provide a federal remedy for the enforcement of federal rights"). Similarly, "the Tax Court is the only court in which a tax dispute may be litigated without first paying the tax ... Before a case may be heard in either the U.S. district courts or the U.S. Claims Court, the tax must

first be paid and a refund claim must be filed." 34 Am.Jur.2d *Federal Taxation* Section 9302 (1987). Thus, the IRS would have an absolute defense, because of the non-payment of assessed tax, in an action in district court or Claims Court, while no such defense would exist for the IRS in a Tax Court action. Just so: section 106(c) was adopted by Congress to provide a bankruptcy-court remedy for the enforcement of Bankruptcy-Code rights; the existence or non-existence of similar rights in some other forum under some other law is totally irrelevant.

22. Memorandum, p. 9.

23. Other cases cited by DOJ, under "accord," are discussed and distinguished in footnote 14 above. For further discussion of the *Lawson* case, *see* footnote 12, *supra*, and text accompanying footnote 27, *infra*.

DOJ argues for the first time in its Reply Memorandum that Section 106(c) does not apply as to Inslaw's claims for money relief be-

that case contains no language construing Section 106(c) in the manner urged by DOJ. Rather, the premise for the court's decision was that Lawson's claim was not truly a Bankruptcy-Code-based claim at all but rather was a state-law-based claim (a "contractual dispute ... in the guise of a turnover action"). 59 B.R. at 689. Since the claim was not based on the Bankruptcy Code, Section 106(c) was inapplicable. The *Lawson* court specifically, in footnote 12, recognized in the following language the authority of *"United States v. Whiting Pools*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (although no proof of claim was filed, turnover order could issue against the Internal Revenue Service ...)"[24] and expressed no disagreement whatever with *"In re Remke, Inc. (Remke, Inc. v. United States)*, 5 B.R. 299 [6 B.C.D. 766] (Bankr.E.D.Mich.1980) (debtor may recover preferential transfer from the Internal Revenue Service notwithstanding the fact that the I.R.S. had not filed a proof of claim)." As the *Remke* court noted: "To construe section 106 as urged by the government, would read subsection (c) out of the Bankruptcy Code. There is no justification for doing so." 5 B.R. at 302.

Rather than accepting DOJ's interpretation, which would indeed substantially "read subsection (c) out of the Bankruptcy Code," this Court adopts the interpretation expressed in *In re Davis, supra*, 20 B.R. at 521–522:

What is excepted by the opening phrase "Except as provided in subsection (a) and (b) of this section"?  Applying again the plain language test, it is mandatory in 106(c), before there is a waiver of sovereign immunity, that (1) the proceeding be brought under a provision of Title 11 and (2) that the provision of Title 11 contain the word "creditor" or the word "entity" or the word "governmental unit."  But, there is excepted from these two mandatory requirements any proceeding that is available under 106(a) or 106(b).  Stated another way, 106(c) means that if the proceeding is brought under 106(a) or 106(b), the two mandatory requirements in 106(c) are inapplicable.  Stated still another way, 106(c) means that notwithstanding any assertion of sovereign immunity by a governmental unit, the sovereign immunity of a governmental unit is waived if a proceeding is commenced under a provision of Title 11 that contains "creditor" or "entity" or "governmental unit" except that these restrictions are inapplicable if the proceeding is brought under 106(a) or 106(b).

In *In re Community Hospital of Rockland County, supra*, the Government made an argument very similar to the argument advanced in this *Inslaw* case, and that court too rejected the Government's argument, noting the separate requirements and scope of each of Section 106's three subsections.  Thus, the court noted: under subsection (a) the debtor's claim must be in the nature of a compulsory counterclaim;  under subsection (b) the

cause the trigger word "entity" appears in subsection 362(a) but not in subsection 362(h), and subsection 362(h) is a separate "provision of this title" within the meaning of Section 106(c). This argument is unpersuasive.  (i) Each of the subsections of Section 362 is an integrated part of one organic whole; each one by itself is incomplete; thus, Section 362 as a whole is one "provision" of the Bankruptcy Code.  It is absurd to contend that "provision" should be read to mean each subsection in isolation.  No court has ever so held, with reference to any section of the Bankruptcy Code that contains one of the trigger words.  (ii) The substantive rights sought to be enforced by Inslaw's complaint all "arise under" Section 362(a), not Section 362(h); Section 362(h) merely specifies certain remedies that are available for violation of those rights.  Thus, even if each subsection of Section 362

were to be deemed to be a separate "provision," the precise language used in subsection 106(c) will be fully satisfied because there will be "a determination by th[is] court" of "issue[s] arising under" subsection 362(a).

24. Although it does not appear that sovereign immunity was raised as a defense in *Whiting Pools*, the following language appearing in the Supreme Court's unanimous opinion in that case may well be significant (462 U.S. 198, 209, 103 S.Ct. 2309, 2316, 76 L.Ed.2d 515 (1983)):

We see no reason why a different result should obtain when the IRS is the creditor.  The Service is bound by Section 542(a) to the same extent as any other creditor.  The Bankruptcy Code expressly states that the term 'entity,' used in Section 542(a), includes a governmental unit.

claim can be used only as an offset with no affirmative recovery possible, but "[s]uch counterclaims and offsets ... may be bottomed on non-bankruptcy statutory or common law rights"; however, subsection (c) requires that the claim be based upon a substantive provision of the Bankruptcy Code containing one of the three trigger words. 15 B.R. at 789.

This Court has found virtually no caselaw or other authority to support the Government's tortured interpretation of the opening clause of subsection (c).[25] To the contrary, there exists a substantial body of caselaw that recognizes Section 106(c) as effectuating a waiver of sovereign immunity for relief of all sorts, including monetary relief against the United States Government (and even against state governments, where the Eleventh Amendment would otherwise stand as a bar to relief). *See* Jones, "Suits Against a State Under the Bankruptcy Code for Retrospective Monetary Relief," 91 Comm. L.J. 278 (1986); *Gardner v. Commonwealth of Pennsylvania Department of Public Welfare,* 685 F.2d 106 (3rd Cir.), *cert. den.,* 459 U.S. 1092, 103 S.Ct. 580, 74 L.Ed.2d 939 (1982) (judgment avoiding liens under Section 522(f)(1)), *In re Neavear,* 674 F.2d 1201, 1204 (7th Cir.1982) (declaratory judgment that a debt is dischargeable under Sections 523 and 727, the court noting that section 106(c), "unlike sections 106(a) and (b), does not condition the waiver of sovereign immunity upon the filing of a proof of claim"); *In re R & L Refunds,* 45 B.R. 733, 736 (Bankr.W.D.Ky.1985) ("We find no support in either the case law or the literal construction of the statute itself that Sec-

tion 106(c) does not waive the United States sovereign immunity in Section 542 turnover actions"; motion to dismiss suit for money judgment denied); *In re Remke, Inc.,* 5 B.R. 299 (Bankr.N.D.Cal.1980) (suit for $145,267.53 money judgment on voidable preference claims against IRS under Section 547 of Bankruptcy Code upheld, pursuant to Section 106(c), as against motion to dismiss on ground of sovereign immunity.)

This point is highlighted by numerous cases wherein courts have upheld or rendered money judgments against governmental agencies for violations of the automatic stay. *United States v. Reynolds,* 764 F.2d 1004 (4th Cir.1985) (money judgment against IRS to turn over funds wrongfully set off in violation of automatic stay); *United States v. Norton,* 717 F.2d 767 (3d Cir.1983) (same) (six more such cases are referred to in footnote 8 of the *Norton* court's opinion). *See also In re Hill,* 19 B.R. 375 (Bankr.N.D.Texas 1982) (declaratory judgment against Farmers Home Administration that its attempted setoff violated automatic stay, entitling debtor to up to $50,000); *In re Eisenberg,* 7 B.R. 683 (Bankr.E.D.N.Y.1980) (certification for criminal contempt proceedings against city that obtained tax payment by giving notice of tax lien sale in violation of automatic stay); *In re Pressimone,* 39 B.R. 240, 243 (N.D.N.Y.1984) (injunction against IRS in aid of automatic stay is not barred by sovereign immunity because it "falls within the broad ambit of the waiver provided by subsection (c)").

Thus, this Court holds: The opening "except as" clause of subsection (c) means simply that, if the debtor's and the govern-

---

**25.** I know of only one judge who has accepted the Government's argument. That judge "conceded that Section 106(c) was *specifically designed* to abrogate sovereign immunity in preference [avoidance] actions, even when the governmental unit files no proof of claim" (emphasis added), but he nevertheless went on to hold that Eleventh Amendment immunity barred just such an action against a state taxing authority. *In re Zera,* 72 B.R. 997, 1002 (D.Conn.1987). The judge's (rather bizarre) reasoning was that "the legislative history does not reveal that sovereign units would be liable even for preference actions which would expend themselves on the sovereign's treasury in the form of retroactive

monetary damages." In fact, however, the legislative history which he himself quoted explicitly states, without the slightest hint of any possible exception for "retroactive monetary damages": "For example, section 106(c) permits a trustee or debtor in possession *to assert avoiding powers* under Title 11 against a Governmental unit." 124 Cong.Rec.H 11091; 124 Cong.Rec.S 17407 [emphasis added]. The same judge reached a similar conclusion in the companion case of *In re Willington Convalescent Home, Inc.* 72 B.R. 1002 (D.Conn.1987), even while acknowledging that numerous other courts, including the Seventh Circuit of Appeals, have reached contrary results.

ment's claims do not arise out of the same transaction or occurrence (and hence section 106(a) does not apply), and if the government has not asserted an informal or filed a formal proof of claim (and hence Section 106(b) does not apply), then sovereign immunity is waived only if the debtor's claim is based upon a provision of the Bankruptcy Code that contains one of subsection (c)'s three trigger words.

■ In conclusion: The Government's asserted defense of sovereign immunity is unavailing in the face of the explicit waivers in Section 106(a) (because the Government has asserted a claim against Inslaw), in Section 106(b) (because the Government's assertion of its claim amounts to an informal proof of claim), and in Section 106(c) (because the debtor's claim is based upon Section 362 of the Bankruptcy Code, and Section 362 contains the trigger word "entity").

III. INSLAW'S CLAIMS DO NOT CONSTITUTE A CLAIM FOR RELIEF UNDER A GOVERNMENT CONTRACT AND THUS THIS COURT SHOULD NOT DEFER ACTION IN FAVOR OF A BOARD OF CONTRACT APPEALS.

■ DOJ next argues that Inslaw's claims, rather than constituting causes of action under Title 11, in fact constitute a government contract claim in the guise of a complaint to enforce the automatic stay. Therefore, and treating Inslaw's claims as a government contract claim, DOJ argues that this court should defer resolution of the matter to the Department of Transportation Contract Appeals Board (or perhaps to the Claims Court).

I find DOJ's position to be without merit. My finding is compelled by the decision of the United States Court of Appeals for the District of Columbia Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (1982). That case is as close to being on all fours with this case as is possible. In *Megapulse*, as here, the plaintiff sought relief against the Government via an injunction against disclosure of technical data in which the plaintiff claimed proprietary rights and which it

asserted were its "very economic life blood." (672 F.2d at 970). There, as here, the plaintiff's claim sounded in tort. There, as here, the Government advanced a defense based on a government contract, claiming that its proposed use of the plaintiff's property was authorized by contract ("It is actually the Government, and not *Megapulse*, which is relying on the contract ...") (672 F.2d at 969). Under the circumstances, this Circuit found, deferral to a Board of Contract Appeals (or the Court of Claims) would be inappropriate. The Court found "no merit" in the Government's contrary contention because the Government "presume[d] a fact as yet unestablished on the merits—that the information which Megapulse is trying to protect actually falls within the scope of the contract. Appellant claims that the information involved 'was not developed under the contract at all.....' We are disinclined to accept the Government's prejudgment of the ultimate (and as yet untried) merits of the action as a basis for a jurisdictional ruling at this stage." 672 F.2d at 966. Inslaw makes exactly the same claim as Megapulse in this regard.

The Court explicitly held that Megapulse's claim was not a "disguised contract action" (672 F.2d at 968 and 969), stating: "... the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have." 672 F.2d at 968. The *Megapulse* Court cited and quoted from, *inter alia:*

(i) *de Magno v. United States*, 636 F.2d 714, 724 (D.C.Cir.1980):

"It is not at all unusual for a court to find it necessary in the course of deciding a dispute over which it does have jurisdiction to decide an issue which would be outside its jurisdiction if raised directly. For example, in deciding a conversion action, a court may have to determine title to property in another state, a question which it would have no competence to decide directly."

(ii) *Aleutco Corp. v. United States*, 244 F.2d 674, 679 (3d Cir.1957) (purchaser of surplus government property could sue Navy for conversion, though purchaser's ownership was based on sales contract; jurisdiction over claim based on tort of conversion was not defeated merely because one element of case was founded in contract); and

(iii) *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947): "The Supreme Court many years ago recognized a private party's cause of action outside the Tucker Act to challenge the statutory authority of federal officials to claim ownership rights in property allegedly transferred during the course of a contract." 672 F.2d at 968–969.

Here, as in *Megapulse*, Inslaw seeks relief against utilization of its claimed property by the Government without just compensation. It is Inslaw's simple assertion that DOJ should make up its mind which if any of the enhancements to PROMIS it wishes to keep and utilize, pay for its use of Inslaw's enhancements, and stop using enhancements if it is not willing to pay for such use. *See also Conax Florida Corp. v. United States*, 625 F.Supp. 1324, 1326 (D.D.C.1985). *And see Dronenburg v. Zech*, 741 F.2d 1388, 1390 (D.C.Cir.1984) (member of armed forces sought to overturn his discharge by challenging constitutionality of discharge regulations; Government argued the action was essentially one for money damages (back pay), precluded by Tucker Act; court quoted *Schnapper v. Foley*, 667 F.2d 102, 107 (D.C.Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982) in holding that "[t]he United States and its officers ... are [not] insulated from suit for injunctive relief by the doctrine of sovereign immunity").

Citing and following *Megapulse*, our Court of Appeals held in *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500 (1984) (*en banc*):

Injunctive [and declaratory] relief is available when the owner proves that government officials acted wrongfully in expropriating his property and money damages would not justly redress the plaintiff's injury, despite an assertion that the Tucker Act would provide compensation.

745 F.2d at 1524. On remand from the Supreme Court, *Weinberger v. Ramirez de Arellano*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), the Court of Appeals dismissed the complaint without prejudice because the facts of the case had developed such that they would no longer justify equitable relief. *Ramirez de Arellano v. Weinberger*, 788 F.2d 762 (D.C.Cir.1986) (*per curiam*). However, the Court left undisturbed its prior holding concerning the appropriateness of injunctive or declaratory relief against the government upon the proper facts.

The case of *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C.Cir.1985), cited by DOJ, does not diminish the significance of the *Megapulse* holding. In *Spectrum Leasing*, there was no question that the case at its core was a contract dispute. Indeed, the complaint itself referred to payments due under a government contract. "Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not by the Debt Collection Act. The DCA, even if it applied, confers no such right in the absence of the contract itself.... ... Spectrum seeks the classic contractual remedy of specific performance." 764 F.2d at 894. The *Spectrum* Court distinguished *Megapulse* on precisely the same basis that also distinguishes this case from *Spectrum* and brings this case squarely within the ambit of *Megapulse*: "In *Megapulse*, by contrast, the plaintiff's proprietary rights in the technical data existed ... apart from rights created under the contract. As the court noted, the *government*, not Megapulse, relied on the contract ..."[26] [Emphasis in original.]

---

**26.** In *Megapulse*, the proprietary rights existed prior to the contract. Inslaw claims that its proprietary rights were created (through private, non-governmental funding) subsequent to termination of its predecessor's government contract. The variation between rights existing *prior* to a contract and those created *subsequent*

One further point is worthy of note. Both *Megapulse* and *Spectrum* were decided under the narrow and restrictive waiver of sovereign immunity contained in the Administrative Procedure Act ("APA"). 5 U.S.C. Section 702. Section 702 explicitly forbids relief under the APA "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." The APA's legislative history expressly states that this "measure is intended to foreclose specific performance of government contracts." [27] By contrast, the Bankruptcy Code's waivers of sovereign immunity are broad, and neither the Code nor its legislative history contains any hint of any restriction such as is found in the APA. If relief was available to *Megapulse* even under the APA's restrictive provision, then *a fortiori* relief must be available to Inslaw under the Bankruptcy Code's broad provisions waiving sovereign immunity.

Also distinguishable on the same basis is the case of *In re Lawson Burich Association, Inc.*, 14 B.C.D. 354 (Bankr.S.D.N.Y. 1986). In *Lawson*, as in *Spectrum*, any right to payment was a governmental contract right, and Lawson like Spectrum sought the classic contractual remedy of specific performance.[28] In addition, *Lawson* involved a state agency and thus issues under the Eleventh Amendment. Moreover, that decision was influenced by law of the case as rendered by a prior ruling of another judge in the same matter, and by the conclusion that the claim presented there, unlike Inslaw's claim, clearly involved a disguised contract claim.

The cases of *In re Gary Aircraft*, 698 F.2d 775 (5th Cir.1983), and *In re Misener Industries, Inc.* 54 B.R. 89 (Bankr.M.D.Fla. 1985), are also distinguishable on the same grounds. In each of those cases, deference to the Armed Services Board of Contract Appeals was predicated upon the fact that the plaintiff sought liquidation of a contract dispute with the Government rather than relief under the Bankruptcy Code. Inslaw's claim in this case is predicated upon violations of the automatic stay of the Bankruptcy Code, which were not involved in *Gary Aircraft* or *Misener*. [29]

## IV. MISCELLANEOUS OTHER ISSUES.

The Government raises a few additional arguments in support of its motion to dismiss, which deserve brief mention here.

to termination of a contract is of course a distinction without a difference.

In its Reply Memorandum (pp. 3–4), the Government cites *Shell Pipe Line Corp. v. West Texas Marketing Corp.* 540 F.Supp. 1155 (D.C.S. D.Tex.1982), and other cases for the proposition that "disputed contract claims are not 'property of the estate' prior to their adjudication" as such by "a court of competent jurisdiction." First, that is not what the cases hold; what they hold is simply that an interpleader action is an appropriate form of proceeding to determine whether property "is in fact property of the estate." 540 F.Supp. at 1161. Second, this Court is a court of competent jurisdiction, and a suit for declaratory, injunctive and other relief under Section 362 is an appropriate form of proceeding to determine whether the property here at issue is in fact property of this estate. None of the cases cited by DOJ holds, or even suggests, to the contrary.

27. H.Rep. No. 1656, 94th Cong., 2d Sess. 12–13 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6121, 6132, 6133.

This Court notes that, in *Megapulse*, although plaintiff did not seek specific performance or monetary damages against the Government, it did seek, alternatively, monetary damages against two individuals.

28. *See also* the discussion of the *Lawson* case in footnote 12, *supra*, and text accompanying footnote 23, *supra*.

29. *Also* distinguishable on the same grounds are *In re American Pouch Foods, Inc.* 30 B.R. 1015 (N.D.Ill.1983), aff'd. 769 F.2d 1190 (7th Cir. 1985), *In re Economy Cab and Tool Co., Inc.* 47 B.R. 708 (Bankr.D.Minn.1985), and the other cases cited on page 21 of the Government's Memorandum.

This Court of course recognizes the familiar proposition that (as noted in footnote 8 of the Government's memorandum and cases there cited) in appropriate instances bankruptcy courts, like other courts, should "defer to the expertise of specialized administrative tribunals and courts." It must be remembered, though, that this Bankruptcy Court is itself a specialized tribunal having "exclusive jurisdiction of all of the property, wherever located, of the debtor ... and of property of the estate." (28 U.S.C. Section 1334(d); Local Rule 601, U.S.D.C.D.C.) Bankruptcy courts are recognized as having particular expertise concerning the Bankruptcy Code and its enforcement.

■ (i) Contrary to the Government's argument, the First Amendment does not bar this Court from issuing an injunction to halt DOJ's claimed disparagement of Inslaw's product. A demonstration of such disparagement would establish a violation of the automatic stay. Inslaw has alleged that actions of the Government which disparaged Inslaw's product have caused Inslaw grievous injury, and this Court must accept those allegations as true for purposes of the motion to dismiss. The Government's reliance upon *In re National Service Corp.,* 742 F.2d 858 (5th Cir.1984) and *In re Stonegate Security Services, Ltd.,* 56 B.R. 1014. (N.D.Ill.1986), is misplaced. In *National Service,* the speech sought to be enjoined dealt with facts which were admitted and which the court characterized as "unassailable." 742 F.2d at 859. Here, of course, the speech at issue is far from being "unassailable fact." Indeed, the speech complained of here is alleged not only to be false and malicious but also to present "a clear and present danger of significant interference with the Debtor's reorganization" and "with the functions of the bankruptcy court," hence falling within the exception expressly noted in *Stonegate.* 56 B.R. at 1020. Inslaw is entitled to an opportunity to prove its claims. *See,* generally, Note, "Enjoining Product Disparagement: Discarding the Defamation Analogy," 64 Wash. U.L.Q. 205 (1986).

(ii) Inslaw has properly, and sufficiently, asserted a claim against DOJ for improper setoff of sums due Inslaw, which action, if proven, would establish a claim for violation of the automatic stay. The Government's position is that its actions were in the nature of recoupment rather than setoff. However, the cases cited by the Government in in support of its position, that a "recoupment" does not violate the automatic stay while a "set-off" does, may well be distinguishable. In *Steinberg v. Illinois (In re Klingberg Schools),* 68 B.R. 173 (D.N.D.Ill.1986), the State unilaterally and retroactively reduced its funding to the debtor in violation of the contract between the parties. This action created pre-petition overpayments which the State attempted to "recoup" post-petition. The Court found that this was not a recoupment but a set-off in violation of the automatic stay, stating "This is clearly not the same situation as present in true recoupment cases, where the overpaid sums were not contested, only the appropriateness of their recoupment." 68 B.R. at 180. The Court went on to cite as "true recoupment cases" every case the Government has cited in support of its recoupment position.

The situation in *Klingberg* is analogous to the one at bar in that Inslaw is contesting the justification of the Government's withholding of funds. In fact, Inslaw has alleged that there is no justification for doing so. This Court is constrained at this point in the litigation to accept as true the well-pleaded allegations of the complaint.

■ (iii) Finally, this Court does not accept the Government's contention that: [30]

Since only "willful" violations of the stay can be compensated, when there is a legitimate dispute as to rights in property in the custody of a creditor, by definition there can be no willful violation of the stay.

It is not true that only willful violations of the stay can be compensated. The courts have imposed monetary sanctions even for an inadvertent violation of the automatic stay. *In re Conti,* 42 B.R. 122, 12 BCD 87 (Bankr.E.D.Va.1984); *In re Gray* 41 B.R. 759 (Bankr.S.D.Ohio 1984); *In re Crabtree,* 31 B.R. 95 (Bankr.S.D.Ohio 1983); *In re Womack,* 4 B.R. 632, 6 BCD 543 (Bankr.E.D.Tenn.1980).

Nor is it true that "a legitimate dispute as to rights in property" precludes a finding of willfulness or an award of compensation. *In re AM International, Inc.* 46 B.R. 566, 577, 578 (Bankr.M.D.Tenn.1985):

[Commerce Union Bank]'s mistaken belief in its right to redirect and dispose of the lockbox payments does not provide the bank with a defense to [debtor]

30. Memorandum, p. 15.

AMI's assertions that the bank violated the stay of 11 U.S.C. Section 362.

\* \* \* \* \* \*

.... The proper recourse for CUB knowing of the bankruptcy filing and of AMI's right to payment under the lockbox agreement, was to seek an adjudication of its competing claims in the bankruptcy court.... As a sophisticated commercial institution familiar with the application and broad scope of the automatic stay, it knew or should have known that its actions would improperly interfere with the orderly collection and distribution of AMI's assets....

It is appropriate to award costs and attorney's fees where an entity has knowingly taken action in violation of the stay.... In this proceeding AMI was completely innocent and had a statutory right to have its assets protected by the bankruptcy stay.... AMI's general creditors should not bear the costs of vindicating the rights and recovering the money lost by AMI when CUB violated the stay.

*In Cusanno v. Fidelity Bank,* 29 B.R. 810, 10 B.C.D. 793 (E.D.Pa.1983), the district court, prior to the 1984 addition of Section 362(h), upheld an award of costs and attorney's fees against a bank that violated the stay by placing an "administrative hold" on the debtor's checking account, even though there was conflict among courts as to whether "freezing" a bank account violates the stay. The court held (29 B.R. at 813):

When there exists a dispute as to the classification of a bank account, neither party has the authority to take action affecting the funds. Instead, the party seeking to take action concerning the funds should first approach the bankruptcy court and file a motion ...

\* \* \* \* \* \*

Even if the bank had possessed a right of setoff against the Cassanos, the bank forfeited this right by failing to seek timely relief in the Bankruptcy Court. A leading case on this point is *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 51 (2nd Cir.1976), *cert. den.,* 429 U.S. 1093, 97 S.Ct. 1107 (1977)

($20,000 fine upheld against counsel for contractors who instituted state-court suit to foreclose mechanics' liens with knowledge that bankruptcy petition had been filed).

In *In re Tel-A-Communications Consultants, Inc.,* 50 B.R. 250, 254 (Bankr.D. Conn.1985), the court construed "willful" to mean "deliberate or intentional." The court concluded (50 B.R. at 255):

Notwithstanding the defendant's claim that it acted in the good faith belief that post petition repossession was justified, the facts here clearly demonstrate that the defendant's agents not only acted intentionally but also with arrogant defiance of federal law. Sanctions under Code Section 362(h) are therefore mandatory, and in this instance, punitive damages are appropriate.

See also *In re American Central Airlines, Inc.* 52 B.R. 567 (Bankr.N.D.Iowa 1985); *In re Elder,* 12 B.R. 491 (Bankr.M.D.Ga.1981).

Finally, in *Budget Service Co. v. Better Homes of Va.,* 804 F.2d 289, 293 (4th Cir. 1986), the court held first that sanctions under Section 362(h) are available as a remedy to corporate as well as individual debtors and then went on to conclude that, because Budget Services "knew of the pending petition and intentionally attempted to repossess the vehicles in spite of it," the "bankruptcy court acted within its power in awarding compensatory damages, attorneys' fees and punitive damages to Better Homes."

For all the foregoing reasons, I have by separate Order denied DOJ's motion to dismiss Counts One, Two and Three of Inslaw's Complaint.